## Edgewood Railroad Company's Appeal.

1. The Acts of April 4th 1868 and April 28th 1871 (formation of railroad corporations), do not authorize the construction of a railroad such as is contemplated by the lateral railroad laws.

2. The object of the Act of 1868 is to vest in voluntary associations the powers which had previously been given only by special acts of incorporation, and applies to railroad companies in the sense in which that term had been commonly used.

3. Nothing in the Act of 1868 affected the legislation as to lateral railroads.

4. The supplement of April 1871 is applicable to settled communities, where the population requires more than the primitive means of conveyance and transportation, but not to promote private fortunes or develop private property.

5. The power of eminent domain is conferred on citizens only when some existing public need is to be supplied or some present public advantage to be gained, but not with a view to contingent results, dependent upon the success of a projected speculation.

6. The railroad in this case was not for public use within the meaning of the Acts of 1868 and 1871.

7. Under the Act of June 19th 1871, a court of equity has jurisdiction to inquire whether a railroad chartered under the Act of 1868 possesses the franchises it claims, and if not, injunction is the appropriate remedy for the wrong.

October 11th 1875. Before AGNEW, C. J., SHARSWOOD, WILLIAMS, MERCUR, GORDON, PAXSON and WOODWARD, JJ.

Appeal from the Court of Common Pleas, No. 2, of *Allegheny county.* In equity. No. 74: Of October and November Term 1875.

The bill in this case was filed June 14th 1873, by The Western Pennsylvania Institution for the Instruction of the Deaf and Dumb against the Edgewood Railroad Company.

29 P. F. SMITH—17

[Edgewood Railroad Co.'s Appeal.]

The bill set out: 1, 2, 3. That the plaintiffs, an incorporated company, owned ten acres of ground in Wilkins township, Allegheny county, near Edgewood station of the Pennsylvania railroad; that the property was acquired for the erection of suitable buildings for the institution for the deaf and dumb. 4. That Thomas C. Dickson, Charles H. Armstrong, William H. Shoenberger " and others," owning a large body of coal in the vicinity of Edgewood station, not being willing to procure means of transporting their coal to the Pennsylvania railroad under the lateral railroad laws, under cover of constructing a railroad for public use, and the general transportation of persons and property over the same, had associated themselves as a corporation, by the name of The Edgewood Railroad Company, under the Act of April 4th 1868.    5. The plaintiffs charged that it was not the intention of defendants to use their railroad for any other purpose than to transport their coal; that the road extended only to the property of the plaintiffs, and of James Kelly, a distance of not more than half a mile from its beginning at the Pennsylvania railroad, ending in hills inaccessible for railroad purposes, at a point uninhabited, running its entire length in close proximity to the Pennsylvania railroad, without any public demand or necessity for it, and was only a contrivance to secure for their private use the advantages granted by the Commonwealth for public purposes.

6. That defendants, without plaintiffs' consent, had taken possession of part of their ground, extending from the Pennsylvania railroad, and curving through plaintiffs' property, having a width of one hundred and fifty feet on the Pennsylvania railroad; and are grading the ground for a railroad, although there are other routes by which they could construct their road without going through plaintiffs' ground; that the route taken was amongst the most eligible for the erection of the plaintiffs' buildings; was the site designated for them, and if the defendants' railroad should be constructed it would greatly impair, if not destroy, the property for the uses to which it had been dedicated.

The prayer was for an injunction to restrain defendants from constructing their railroad, &c.

The defendants by their answer denied that the plaintiffs owned the ground through which defendants were constructing the road; they denied that they had acted from the motives charged in the fourth paragraph of the bill.    5. They denied all the allegations in the fifth paragraph of the bill.    6. They averred that the route selected by them for their road was the most eligible and calculated to do the least injury to private property.    They averred that they were a corporation under the Act of April 4th 1868, and its supplement of April 28th 1871, to build a railroad " from a point near to and west of Edgewood station on the Pennsylvania railroad to the Hampton Coal Mines, near the eastern terminus of the village of Wilkinsburg; that prior to the final location of

[Edgewood Railroad Co.'s Appeal.]

their road, they made an examination as to the ownership of the land and ascertained that the record title was in James Kelly; that they tried to agree with him for the damages without success, and on the 21st of June 1873, they tendered to him a bond for the damages, which he refused to accept; the bond was then presented to the Court of Common Pleas and approved, and it was filed of record in that court.

The Act of April 4th 1868, Pamph. L. 62, 2 Br. Purd. 1211, enacts: Sect. 1. That any number of citizens of Pennsylvania, not less than nine, may form a company for constructing and operating " a railroad for public use in the conveyance of persons and property," and for that purpose may enter into articles of association. Sect. 2 further designates the form, &c., of the articles; it directs that they shall be filed in the office of the secretary of the Commonwealth, &c., " and thereupon the said articles of association shall become and be a charter for the said company," &c., and the persons subscribing the articles, and others becoming stockholders, shall be a corporation, &c.

Sect. 3. That a copy of the articles of association filed, &c., in pursuance of the act, certified by the secretary of the Commonwealth, " shall be evidence of the incorporation of such company and of the facts therein stated."

Sect. 5. Upon complying with the provisions of the act, the company have authority to carry into effect the objects named in it, as if they had been incorporated by a special act of the legislature, and may exercise all the privileges, &c., and be subject to all the restrictions of the General Railroad Law of February 19th 1849 and its several supplements.

Sect. 9. Authorizes the corporation to construct branches.

Sect. 12. Prohibits the corporation from making street passenger railways by virtue of this act.

The Act of April 28th 1871, Pamph. L. 246, 2 Br. Purd. 1213, enacts : Sect. 1. That three persons may become a company as provided by the Act of 1868, to construct, &c., a railroad for public use, &c., which shall not be longer than five miles.

The Act of June 19th 1871, Pamph. L. 1361, 1 Br. Purd. 288, pl. 39, enacts : Sect. 1. That in proceedings in courts of law and equity, in which it is alleged that the private rights of individuals or of corporations are injured or invaded by any corporation claiming a right or franchise to do the act from which such injury results, the court may " inquire and ascertain whether such corporation does in fact possess the right or franchise to do the act, * * * and if such rights or franchises have not been conferred on such corporation, such courts if exercising equitable powers shall, by injunction * * * restrain such injurious acts." * * *

On the 5th of January 1871, James Kelly executed a writing, reciting that a number of citizens of Allegheny county interested

in the welfare of the deaf and dumb near Pittsburg, were desirous that an institution in that vicinity for their education should be incorporated, and Kelly, being desirous of promoting the object, proposed to give ten acres of land near Edgewood station, in Wilkins township; and in consideration of the premises, Kelly agreed to convey the land to James P. Sterrett and others in fee, in trust for the purposes above mentioned, to be conveyed to the corporation when a charter should be obtained, the conveyance not to be executed until $20,000 should be subscribed for the erection of suitable buildings.

The plaintiffs were incorporated April 12th 1871, and prior to April 1872, the sum of $20,000 was subscribed as stipulated in Kelly's agreement; on the 15th of December 1873, Kelly conveyed the land to plaintiffs.

Under the Act of 1868 and its supplement of 1871, W. H. Shoenberger, Charles H. Armstrong, John Z. Spier, Thomas C. Dickson, J. McC. Creighton, Francis Ardary, Charles L. Fitzhugh, G. A. Steiner, Thomas Blair and Robert Dickson, upon complying with the requirements of the acts, were on the 24th of May 1873, constituted a corporation by the name of the Edgewood Railroad Company, to continue for ninety-nine years, for the purposes set out in the bill and answer, the length of this railroad to be about one mile.

On the 31st of March 1873, George R. Johnson leased to John Dickson, Robert Dickson, Thomas C. Dickson, John S. Stewart and Joseph C. Dickson, trading as Dickson, Stewart & Co., a piece of land in Wilkins township, " to be used as or for a right of way for their coal railroad and for no other purpose whatever except as herein provided," &c., " beginning at a point on land of James Kelly," and the northermost line of the right of way of said railroad and by various courses and distances " to the line of Kelly's land aforesaid," containing $9\frac{7}{10}$ acres, to hold, &c., as long as the lessees shall use it as a right of way in accordance with the terms of the lease, paying an annual rent of $1000, &c.; it was further stipulated " that the piece or tract of land hereby leased for said right of way shall not be used for any other than right of way, purposes and such purposes as are necessary for the ordinary working of coal works and coal railroad, but it is expressly agreed and understood that no buildings shall be erected upon the same except such as may be necessary for the purposes of coal railroad and works."

A replication was filed to the answer, and D. D. Bruce, Esq., was appointed examiner and master.

The master found that at the time of filing the bill the plaintiffs were the owners of the *locus in quo.*

He also found that the body of coal land mentioned in the fourth paragraph of the bill was purchased in April 1872 by Dickson, Stewart & Co., who held the title for the " Hampton Coal

[Edgewood Railroad Co.'s Appeal.]

Company," a private association, composed of Shoenberger & Co., Charles H. Armstrong and Dickson, Stewart & Co., each owning one-third. W. H. Shoenberger, C. H. Armstrong, J. Z. Spier, C. L. Fitzhugh and T. S. Blair of the firm of Shoenberger & Co., were stockholders of the defendants, Thomas C. Dickson, Robert Dickson of the firm of Dickson, Stewart & Co. were stockholders of defendants; G. A. Steiner and C. H. Armstrong were also members of both companies; J. McC. Creighton and Francis Ardary, who were stockholders of defendants, had no interest in the Hampton Coal Company but could purchase an interest any time. The master thereupon found, that the persons named in the fourth paragraph of the bill as owners of the coal, and others composed the corporation of Edgewood Railroad Company. In his report the master says:—

The main questions involved in the case are:—

1. Whether the defendants' road is a railroad for public use such as is contemplated under the Act of April 4th 1868 and its supplement of April 28th 1871?

2. Had the defendants complied with their charter in building their railroad?

In considering these questions, the master found:—

"The Edgewood railroad is situated on the Pennsylvania railroad, about seven miles east of the Union depot, in the city of Pittsburg; its terminus a quo is on the east side of the Pennsylvania railroad, about midway between Wilkinsburg and Edgewood stations; and its terminus ad quem at the Hampton coal mines, near to the eastern terminus of the unincorporated village of Wilkinsburg. It is sixty feet in width, and forty-seven hundred feet in length between its termini. Its grade is from one foot to one foot and a half in the hundred feet, ascending from the Pennsylvania railroad to its eastern terminus at the coal mines. Its eastern terminus is in a ravine, known as Johnston's ravine, and the bed of the road at this terminus is about one hundred feet below the level of the stratum of coal of the Hampton Coal Company. The ravine is surrounded by the hills at both sides and at its eastern end." * * *

A portion of the ground covered by the Johnston lease " extends from Kelly's line east to the township road, a distance of 780 feet, is only 33½ feet wide, and is the exact ground on which the Edgewood railroad is now built. East of the said township road, and on the line of the road, the leased ground widens out to about 125 feet, and as it extends up the ravine it widens still more, its greatest width being from 250 to 275 feet, including within its limits the line of the Edgewood railroad, and also the incline railway of the Hampton Coal Company, and also extending on to the coal openings of that company. * * * The lease from Johnston, of the right of way, now belongs to the Hampton Coal Company.

[Edgewood Railroad Co.'s Appeal.]

"Immediately after the incorporation of the Edgewood Railroad Company, we find it adopting as the site of its road * * * the exact ground from Kelly's line into Johnston's ravine, as the same is described as the coal road in the lease of Johnston to Dickson, Stewart & Co., which then belonged to the Hampton Coal Company. Looking at these facts connected with the coal of the Hampton Coal Company, it is very evident that the Edgewood Railroad Company was projected and originated by that coal company, and that the primary object and design in constructing the Edgewood railroad, was for the purpose of connecting the Hampton coal mines with the Pennsylvania railroad, so that the coals from those mines could reach a market. * * * If the facts in this case demonstrate that there is no public demand or necessity for the railroad of the defendant, and that it is not the intention to maintain and operate the same for public use in the conveyance of persons and property, then the road is a nuisance, and should be abated from plaintiff's property. * * *

"For what public use in the conveyance of persons and property will the defendants' railroad be maintained and operated?

"This railroad connects with the Pennsylvania railroad about midway between the Wilkinsburg and Edgewood stations, then extending eastwardly it passes over the *locus* of ·this controversy a distance of about 700 feet, then over land of James Kelly, until it comes to the line of the lease of right of way of the Hampton Coal Company, a further distance of about 200 feet; then over the right of way and crossing the township road, a distance of about 2000 feet to the eastern terminus, having an entire length of 4700 feet. From the Pennsylvania railroad to that township road it passes through an unimproved rural country having in the vicinity of its line but one or two farm tenements and the 'Sheltering Arms and Old Woman's Home,' near to the Pennsylvania railroad. As to the present improvements along the line of this road, the road can be of no public utility. * * * The road of the length specified in its charter, as now made, could not be a conveyance for residents along its line to reach the Pennsylvania railroad. It would land ⁚ them midway between stations. It could not afford to run trains ⸴ frequently, and their proximity to the Pennsylvania railroad would render this road entirely unnecessary for their use. The adjacent ground is too costly for manufacturing sites, and better adapted for residences in the extension of the village of Wilkinsburg. There are many much cheaper sites for manufactories, within short distances, along the main line of the Pennsylvania railroad, where fuel could be obtained with equal cheapness, of as good quality as could be furnished by this road of defendant's, and where water, which this locality does not supply, could be had.

"The contingency for the use of this ground for manufactories is so remote, and the advantage this road would be to them, so

slight, that the master does not consider that the road of defendant would acquire therefrom any characteristic of being for public use.

"The defendant's company claim * * * that under their charter they have a right to extend the same by additional branches. That at and beyond the eastern terminus of their road there is a large coal field of some 1500 or 2000 acres, owned by different parties, and that it cannot be mined and utilized for want of proper artificial access to, or means of reaching and mining the same, and the conveyance thereof to market. * * * That a branch of their road could be taken by a short tunnel through the hill at its eastern terminus, to a fertile valley, called Crab valley; that by extending this branch north, up the valley, other coal fields could be reached,. which in being mined would bring a population to that locality, enhance the value of the lands, and afford a means of transportation therefrom to the Pennsylvania railroad and the city of Pittsburg, for persons and property. * * *

"The coal field extends north and eastwardly, from the eastern terminus of the Edgewood railroad to Thompson's run, at Turtle Creek station, on the Pennsylvania railroad, about thirteen miles east of Pittsburg Union depot."

The master describes the character and size of the coal field, and the advantages which exist for mining it, &c.

He then proceeds:—

"It also appears when the topography of the land is considered, with reference to the taking out of the coal, and its transportation to the city of Pittsburg and western markets, that the location of the road is as good, and probably better, than any other that could be selected. * * *

"The Edgewood railroad can be of no public use to persons residing, or property located between its termini, and it may never have any branches or further extension. It is not likely to have any except into the coal. * * * There is not any coal shown by the defendants adjacent to Crab Valley, which a branch of their road would reach, that would come out by their road, except the Kelly coal, and they have shown conclusively that the better way to mine and take out that coal is by the Hampton Coal Openings. There would be no industry connected with coal mining in Crab Valley, no inducement for increased population there on that account. No population there now, and no inducement either now or in the future to build a branch road into a locality so convenient to the main line of railroad, that the branch would connect with if made, to wit: The Pennsylvania railroad.

"The master is therefore of the opinion, and so finds, that under the facts of this case, the only extension or branch of the defendants' road that is feasible, to the interest of its main line as described in its charter, would be a branch or branches through the coal field, through the stratum of coal, and for the sole use and

purpose of transporting the coal when mined, and the carrying of persons and property connected with that business.   He also finds that the only object and purpose of the construction of the Edgewood railroad, was for the transporting of the coal from the Hampton coal mines, and such other coal in the adjacent coal field, as might be brought to it, or might be reached by it, by a branch or branches, into the coal of the field, to the Pennsylvania railroad. * * *

" The view taken by the master of the meaning of the term *public use* indicates to him the propriety of passing on this question as an open one. * * *

" The capacity of the Edgewood railroad, when in complete working order, will according to the testimony be 50,000 bushels per day.   About 200,000 bushels of coal is contained in, and can be taken out of an acre of the coal field in question.   And the Hampton Coal Company owning about 360 acres, their coal would be exhausted in about four years.   * * *

" If the Hampton Coal Company should acquire no additional coal lands hereafter, then when that which they now own would be exhausted, it would be the policy of, and a necessity for the Edgewood railroad to extend its road into the coal field, in order to realize a return of the outlay so made.   So that it appears to the master, to be immaterial whether the Hampton Coal Company purchases more coal, or the railroad company extends its road ; in either event, the value of the coal in the whole field is greatly enhanced, the value of the different tracts in the field equalized, and hundreds of acres of coal made accessible for use, that without the Edgewood railroad would have been locked up and inaccessible for the market.

" This then is wherein the Edgewood railroad is of utility. The mining of 50,000 bushels of coal per day would give employment to hundreds of persons.   They must have homes near the mines and food to live on.   Their wages would be spent in the neighborhood for rents and subsistence.   The value of property would be enhanced thereby.   All the owners of coal would be benefited by its increased value, and the public at large would be benefited by this coal field being brought into market, in the like manner that they are benefited by other developments of the mineral wealth of the state.

" Under the lateral railroad laws, the party proposing to build a road, has a right to designate the line of the route of his road, and if he cannot agree with another party through whose land the road is to pass, an application must be made to the court to appoint a jury of three persons to decide the questions between the parties ; and it is made the duty of these jurymen to decide upon the *necessity* for the road.   This decision of the jury may be appealed from, and the litigation in connection with this proceeding may be

lengthened out for years, by stubborn litigants and ingenious counsel. * * * The Acts of Assembly of 1868, and more particularly that of 1871, remedies this difficulty and evil. Under their provisions the power of *eminent domain* of the Commonwealth is vested in three or more persons to decide upon the *necessity for*, and to build a railroad, the construction of which must of necessity result in the beneficial effects and public good above indicated, with perhaps many other good results that have not suggested themselves to the master." * * *

The master reported as " a summary of his findings :"—

1. The plaintiff had such title to the *locus in quo* as enables it to enter and prosecute this proceeding.

2. That the building of defendant's railroad through this property of plaintiff, destroys its value for the purpose intended by the plaintiff, viz. : as an institution for the instruction of the deaf and dumb.

3. That the railroad of defendants is constructed from a point near to and west of Edgewood station, on the Pennsylvania railroad, as required by the charter of defendants' company.

4. That defendants' railroad is for public use in connecting the coal fields, within described, with the Pennsylvania railroad; being for the development of the coal mineral wealth of that neighborhood, in the transportation of coal from the Hampton coal mines, and such other coal as may be brought to it, or may be reached by its branches.

5. That while the eastern terminus of defendants' road is on the right of way of the Hampton Coal Company, that fact does not prevent the defendants from extending branches over or across the same.

6. That individual members of all the firms which own the Hampton coal mines, are stockholders in the Edgewood Railroad Company, and own together 240 shares of the stock of that company, which gives the said owners of stock the controlling interest therein.

7. That the defendants' railroad is located upon the best and most advantageous route to connect the said coal field with the Pennsylvania railroad, and that it is so located in conformity with the requirements of the charter of defendants' company and of the law.

Exceptions were filed to the report by both parties; those of the defendants were overruled and those of plaintiffs sustained.

The court (Kirkpatrick, J.) " decreed that said defendants be, and are hereby perpetually enjoined from constructing, maintaining and operating their railroad over, through, and upon the premises of said plaintiff as described in said bill ; that defendants restore said premises to the condition they were in when the said defend-

[Edgewood Railroad Co.'s Appeal.]

ants committed the acts and grievances charged in said bill; and that said defendants pay all the costs in the case." * * *

The defendants appealed to the Supreme Court. They assigned the decree for error.

*J. Dalzell* and *M. W. Acheson* (with whom was *J. H. Hampton*), for appellants.—The question whether a public necessity exists, to justify the exercise of the power of eminent domain and to decide to whom to delegate the authority of carrying it out belong to the legislature: Cooley on Const. Lim. 538; Smedley *v.* Erwin, 1 P. F. Smith 445. This power may be granted by general law: Buffalo & N. Y. C. Railroad Co. *v.* Brainard, 9 N. Y. 100. If the public interest can be promoted by taking private property, whether the benefit be sufficient to exercise the right of eminent domain rests with the legislature: 2 Kent's Com. 340; Cooley on Const. Lim. 532. A public use is where government is supplying its own need or furnishing facilities for its citizens as to matters of public necessity, convenience or welfare, which from their peculiar character and the difficulty of providing for them otherwise, it is useful for the government to provide: Cooley 533; Whiting *v.* Sheboygan Railroad Co., 25 Wisconsin 195; People *v.* Salem, 20 Mich. 482. The state retaining the right to control or resume the franchises shows that the road is for public use: Hays *v.* Risher, 8 Casey 169.

*S. Schoyer* and *G. P. Hamilton,* for appellees.

Mr. Justice WOODWARD delivered the opinion of the court, January 4th 1876.

No doubt is entertained that at the time of the organization of the Edgewood Railroad Company, the plaintiffs had such title to the land which the defendants have appropriated, as to enable them to maintain this bill. The authorities referred to on the argument fully vindicate the finding of the master on the facts reported.

Voluminous as this record is, it presents but one significant question for discussion and decision. Can such a railroad as that which the facts found by the master prove the defendants to have built, be maintained under the provisions of the act "to authorize the formation and regulation of railroad corporations," passed on the 4th of April 1868, and the supplement to it passed on the 28th of April 1871? It is alleged by the plaintiffs that these acts have been wrested from their intended purpose to secure a public benefit, in order to promote a purely private enterprise, and that the construction of their road by the defendants under the charter which they hold, has been a fraudulent evasion of the provisions of the statutes relating to lateral railroads.

The first section of the Act of 1868 authorizes any number of

citizens, not less than nine,.to form a company for constructing a railroad for public use in the conveyance of persons and property. The supplement permits any number of persons, not less than three, to form a company to construct, maintain and operate a railroad not exceeding five miles in length, for public use as provided for in the original act. In pursuance of this legislation, the defendants obtained their charter, the due legal form of which (except in an alleged inadequate description of the *terminus a quo*, not now material), is not contested. They have built and are operating a road forty-seven hundred feet in length connecting with the Pennsylvania railroad at a point midway between the Edgewood and Wilkinsburg stations of that railroad, being fourteen hundred and fifty feet from each, and extending to a point on land leased by Dickson, Stewart & Co. for the defendants, from George R. Johnston, on the 31st of March 1873. The eastwardly portion of the road for the distance of seven hundred and eighty feet, as well as the eastern terminus, is on these leased premises, which include also the ground covered by the incline railway of the Hampton Coal Company, and extend to that company's coal openings. The grant to the lessees was "for a right of way for their coal railroad, and for no other purpose whatever, except such other purposes as are necessary for the ordinary working of coal works, and with the privilege of erecting thereon a blacksmith's shop, carpenter's shop, and an engine-house, but no other buildings whatever." The eastern terminus is in a ravine, which is simply a cave in the hills, surrounded by hills on both sides and at its eastern end, and the bed of the road at this point is one hundred feet below the level of the stratum of coal belonging to the Hampton Coal Company. All of the stockholders of the Edgewood Railroad Company are stockholders of the Hampton Coal Company, except J. McC. Creighton and Francis Ardary, and they can have an interest whenever they choose to pay for it. The railroad was projected and constructed with the primary object and design of connecting the Hampton mines with the Pennsylvania railroad, in order that the coal from those mines should reach a market. Indeed, the master has found that this was the only object of the enterprise. In view of any present improvements along the line, it is of no utility. It is wholly unnecessary for the conveyance of passengers both at present and in the future, and the ground adjacent to it can never be used for manufacturing purposes. It was urged before the master that under the authority conferred by the Act of 1868 to build branches, the road can be so extended as to develop a large and valuable coal field, containing some fifteen hundred or two thousand acres. This the master reports to be true. He finds that the Hampton Company's coal will be exhausted in less than five years; that by a subterranean route the road can be so extended as to open availably to market the

[Edgewood Railroad Co.'s Appeal.]

coal upon the lands lying between the present eastern terminus and Johnson's run; that it would be to the interest, both of the coal company and the railroad company, that some connection should be made with the unmined coal in the field as rapidly as the vein is taken out of the field and exhausted; and that "if the Hampton Coal Company should acquire no additional coal lands hereafter, then when that which they own would be exhausted, it would be the policy of and necessity for the Edgewood company to extend its road into the field, in order to realize a return of the outlay made." The report then continues in these words: "It appears to be immaterial whether the Hampton Coal Company purchase more coal, or the railroad company extends its road; in either event, the value of the coal in the whole field is greatly enhanced, the value of the different tracts in the field equalized, and hundreds of acres made accessible for use that without the Edgewood railroad would have been locked up and inaccessible for the market. This then is where the railroad is of utility. The mining of 50,000 bushels of coal per day would give employment to hundreds of persons. They must have homes near the mines and food to live on. Their wages would be spent in the neighborhood for rents and subsistence. The value of the property would be enhanced thereby. All the owners of coal would be benefited by its increased value, and the public at large would be benefited by this coal field being brought into market, in the like manner that they are benefited by other developments of the mineral wealth of the state." Upon grounds thus stated, the master found that the road was constructed for public use, and that its maintenance and operation are authorized by law. Exceptions filed to the report by the plaintiffs were sustained by the court below, and a decree was made enjoining the defendants from constructing, maintaining and operating their road, upon the premises of the plaintiffs, and directing a restoration of the premises to the condition they were in when the grievances charged in the bill were committed. The case is here on appeal from this decree.

The legislation under which the rights of the defendants are asserted, confers large powers upon associations of individual citizens, the exercise of which may be capable of producing varied forms of mischief. The passage of the Act of the 19th of June 1871, therefore, was a wise and salutary measure of precaution. The first section of that act makes it the duty of the court in which any proceeding is pending where an injury is alleged to have been caused by a corporation claiming a right or franchise to do the act by which the injury is produced, to inquire and ascertain whether the right or franchise claimed by the corporation is actually possessed. When this suit was commenced, the defendants were engaged in constructing their railroad upon the land of the plaintiffs, and the complaint was that they were doing this in vio-

lation of law.   It was alleged that a lateral railroad was being built for private purposes without compliance with the statutes authorizing such a road, and under cover of a charter obtained under the Acts of 1868 and 1871.   If the facts warrant the charges in the bill, the jurisdiction of the Common Pleas was unquestionable, and was discreetly exercised.   Such a jurisdiction is in contravention of no rule which preserves legislative authority from judicial invasion.   That the control of the right of eminent domain rests with the legislature  (Cooley on Const. Limitations 538), and that the degree of the public necessity for the exercise of that right is exclusively for their ascertainment (Smedley v. Irwin, 1 P. F. Smith 445), is undoubted.   But there does not appear to be anything in this case to require the application of any such principle. It is not necessary even to approach the question of legislative power to create this corporation, and to vest it with all the rights it claims.   The inquiry is solely as to what has been the action of the corporation, and as to the extent to which the franchises it is exercising have been conferred.

The object for which the Act of 1868 was passed is unmistakable. It was to vest in voluntary associations of individuals, under definite, uniform and general rules, powers which had previously been given only by special acts of incorporation.   It applied to railroad companies in the sense in which the term had always been commonly employed.   Passenger railways were expressly excluded from its operation.   The companies to be chartered under it were made subject to the provisions of the General Railroad Law of 1849, and not one word was contained in it by which the legislation in regard to lateral railroads could be affected.   The Act of the 28th of April 1871, was a supplement to the Act of 1868, simply reducing the number of the corporators to three in the case of a road not exceeding five miles in length.   These corporators, however, were still to constitute a railroad company, subject to the terms of the original act and to those of the Act of 1849.   Provision for so short a road could only have been made in order to secure some general public good.   The supplement was manifestly intended to apply to settled communities, with a population at least so moderately dense as to require more than primitive means of conveyance, and with industries so varied and diversified as to require more than primitive facilities for the transportation of the products of machinery, labor and land.   It was passed to provide for the convenience and necessities of masses of men, and not to promote private fortunes or develop private property.   The Commonwealth transfers to her citizens her power of eminent domain only when some existing public need is to be supplied, or some present public advantage is to be gained.   She does not confer it with a view to contingent results which may or may not be produced, and may or may not justify the grant, as a projected speculation may prove

successful or disastrous. Provision of the most ample kind has
been made to meet individual requirements. The lateral railroad
statutes afford every necessary facility for developing private pro-
perty and transporting its products. And there are substantial
reasons why the field within which those statutes operate should
not be invaded. Owners of lands are protected by safeguards in
their provisions which do not shield them when public ends are to
be promoted. They have the right to demand the interposition of
those safeguards when private property is appropriated for strictly
private use.

The facts found by the master prove in the distinctest way that
this railroad is a mere appertenance to the mines of the Hampton
Coal Company. The reasons for his decision that it has been con-
structed for public use are speculative, strained and vague. They
have in view remote and contingent conditions, of the realization
of which nothing even of probability is shown by the report. The
road is completed between the termini specified in its charter. The
capital of the corporation has been nearly if not entirely expended.
It cannot of course be said that it is impossible that new capital
shall be subscribed, the hill that bounds the eastern terminus tun-
nelled, the coal lands beneath which the extension may be con-
structed developed, and industries created that would make the
enterprise of public importance and public use. But all these
possibilities are too remote to be ground for anything beyond con-
jecture. To rest the legal rights of parties on such chances would
be simply to obliterate those rights. In its existing condition, not
one element of public advantage has resulted from this road that
would not be gained by the construction of any lateral railroad
extending from a great highway like the Pennsylvania railroad to
coal mines of the kind and capacity of those of the Hampton
company. For the distance of seven hundred and eighty feet,
including the eastern terminus, the defendants are precluded from
affording facilities for any business but their own by the very terms
of the grant of the right of way they obtained from Johnston.
They are confined to the use of the land for such purposes as are
connected with the ordinary working of coal property. "The
conveyance of persons and property," in the sense in which those
words are used in the Act of 1868, would be out of the question.
The connection with the Pennsylvania railroad is at a point four-
teen hundred and fifty feet from any station, nearly one-third of the
entire length of the Edgewood road, and the statement of the fact
is alone sufficient to make any idea of using it for the conveyance
of passengers preposterous. There is the coal of the Hampton
company to be carried, and there is nothing else.

Hardly as the rule may bear on these defendants, it is the plain
duty of the courts to prevent the perversion of enactments passed
for one purpose in order to subserve other and inconsistent objects.

To every legal intent this road is a lateral railroad. The right and franchise which the defendants claim to construct, maintain and operate it, was not conferred by the Acts of 1868 and 1871, and the charter in pursuance of them which they have obtained. In reality it has been throughout the property of the Hampton Coal Company as exclusively as the incline railway, schutes and fixtures at their mines. It is no more within the general railroad legislation of the state than was the road which was enjoined by this court under the powers granted by the Act of the 19th of June 1871, in McCandless's Appeal, 20 P. F. Smith 210. It has been built in sheer defiance of legal provisions, the due observance of which could alone have justified its existence, and its maintenance would be a fraud upon the law.

To prevent the chance of misconception, the statement is repeated that the question of the legislative power to grant the right of eminent domain to associations of individuals for corporate purposes, has not been considered. It may be added that nothing which has been said has been designed to affect, limit, or disturb the corporate organization or the general corporate power of the Edgewood Railroad Company. The points decided are briefly recapitutated :

I. When the bill was presented to the Common Pleas, the plaintiffs had title to the land the defendants had appropriated.

II. On this land the defendants have laid and are operating a lateral railroad for private use, without the observance of any of the forms prescribed by the lateral railroad statutes.

III. The Acts of 1868 and 1871 were passed to provide for the organization and regulation of railroad corporations authorized to construct railroads, subject to the provisions of the General Railroad Law of 1849, for public use.

IV. The charter of the defendants did not warrant the appropriation they have made of the land of the plaintiffs for the purpose to which they have applied it. They are trespassers, as they would be if, under cover of their charter, they had entered on the land to build a turnpike or open a mine.

V. It follows that the defendants do not possess the right or franchise to do the acts which have resulted in the injury of which the plaintiffs complain. And in the circumstances of this case, under the Act of the 19th of June 1871, a bill for an injunction is the appropriate remedy for the wrong.

Decree affirmed, and appeal dismissed, at the costs of the appellants.