## Washington Park, Inc. Appeal.

Argued October 5, 1966. Before BELL, C. J., MUS-MANNO, COHEN, EAGEN, O'BRIEN and ROBERTS, JJ.

*Samuel L. Rodgers,* with him *John W. Mamula, Davis G. Yohe* and *Richard A. Zappala,* for condemnee, appellant.

*Thomas F. Nelson,* with him *Judd N. Poffinberger, Jr.,* and *Kirkpatrick, Pomeroy, Lockhart & Johnson,* for lessee, appellant.

*George R. Specter,* Assistant Attorney General, with him *Guy S. Mamolito* and *Robert W. Cunliffe,* Assistant Attorneys General, *John R. Rezzolla,* Deputy Attorney General, and *Edward Friedman,* Attorney General, for Commonwealth, appellee.

OPINION BY MR. JUSTICE ROBERTS, May 3, 1967:

This is an appeal from the dismissal of preliminary objections in an eminent domain case. Pursuant to the Eminent Domain Code of 1964,[1] the Commonwealth condemned land in South Strabane Township, Washington County, for the purpose of providing access lanes connecting U.S. Interstate 70, which crosses U.S. 19 near the situs of the condemnation, and U.S. 19. As part of this project, the Commonwealth found it necessary to widen Oak Spring Road, a two lane, eighteen foot highway, which is parallel to Interstate 70 and also intersects U.S. 19. Washington Park, Inc. (also known as K-Mart), a shopping center located on the western side of U.S. 19 between Oak Spring Road and Interstate 70 and the condemnee in these proceedings, filed preliminary objections alleging that the taking was an unconstitutional exercise of the Commonwealth's power of eminent domain because said taking was in fact for a private rather than a public purpose.[2]

Washington Park concedes that its objection to the condemnation stems from its belief that the principal beneficiary of the highway improvement project will be a rival shopping center, Southgate Shopping Center, Inc., which will be located directly to the west of ap-

---

[1] Act of June 22, 1964, P. L. 84, 26 P.S. §1-101 et seq. (Supp. 1966).

[2] While the condemnation affected other property besides Washington Park, appellant is the only landowner who has pressed objections. S. S. Kresge Company, a tenant of Washington Park, has also appealed from the adjudication below; Kresge's appeal will be considered separately in a later portion of this opinion.

pellant. Without this improvement Southgate's only connection with a major highway will be via Oak Spring Road, whereas Washington Park has frontage directly on U.S. 19. The deceleration lane from Interstate 70, on the other hand, will service both plazas. The condemnee-appellant's assumption that the proposed improvements will benefit Southgate is supported by the record, for Southgate's tenants have made the highway improvements a condition of their leases. Moreover, condemnee points to an agreement in which Southgate agrees to indemnify the Commonwealth for its liability to Washington Park arising out of the condemnation.

By its preliminary objections, appellant requested that the Commonwealth's declaration of taking be stricken and title to the property be revested in its corporate name. Though Washington Park objects to the entire highway project, only a small portion of their land, approximately 1200 square feet, is involved in this appeal.[3] Nonetheless at the hearing on the preliminary objections the court below permitted appellant considerable latitude in the introduction of its testimony in order to afford it ample opportunity to sustain its allegation that the entire project was conceived by Southgate, with the aid of Commonwealth officials, and was designed solely to benefit Southgate. The court below, however, concluded not only that the condemnee had failed to substantiate its charges but also that "there was not one scintilla of evidence of fraud, corruption or misfeasance."[4] The court's conclusions were approved by an en banc panel; we likewise find the condemnee's contentions to be without merit.

---

[3] The extent of appellant's damages resulting from the condemnation are in no way involved in the present litigation.

[4] The record in this case consists solely of the evidence adduced by the appellant in support of its preliminary objections.

The Secretary of the Department of Highways has condemned the land in question under the statutory authorization contained in the Act of June 1, 1945, P. L. 1242, §210, 36 P.S. §670-210. We have no power to substitute our discretion for his, nor to correct mistaken judgments. Furthermore, it is presumed that the highway department's officials have performed their duties in good faith; the burden upon the appellant to prove the contrary, that the officials acted in a capricious, or fraudulent manner, or that their actions were based upon private motives inconsistent with the public welfare, is a heavy one. See, e.g., *Crawford v. Redevelopment Auth.*, 418 Pa. 549, 553-54, 211 A. 2d 866, 868 (1965); *Blumenschein v. Pittsburgh Housing Auth.*, 379 Pa. 566, 570-74, 109 A. 2d 331, 333-35 (1954); *Robb v. Stone*, 296 Pa. 482, 146 Atl. 91 (1929).

We, of course, agree with appellant that the Commonwealth may condemn land only for a public purpose. Nevertheless while the power of eminent domain may not be employed "for the mere purpose of devoting it to the private use of another, even though there be involved in the transaction an incidental benefit to the public," *Belovsky v. Redevelopment Auth.*, 357 Pa. 329, 340, 54 A. 2d 277, 282 (1947); cf. *Price v. Philadelphia Parking Auth.*, 422 Pa. 317, 221 A. 2d 138 (1966), the taking does not "lose its public character merely because there may exist in the operation some feature of private gain, for if the public good is enhanced it is immaterial that a private interest also may be benefited." *Belovsky v. Redevelopment Auth.*, supra at 341, 54 A. 2d at 283. "Highways almost always benefit the owners of land through which they are laid out, and are often constructed at the request of individuals . . . but it has never been held that the laying out of a highway . . . is invalid on that account." 2 Nichols, Eminent Domain §7.222[2] (3d ed. 1963).

In a slightly different context, our courts have already rejected appellant's argument, for legislation authorizing the taking of land in order to build a private road whose principal purpose was to provide an individual with access from his property to a highway has on several occasions been held to be for a public purpose and hence constitutional. See *Waddell's Appeal,* 84 Pa. 90, 93-94 (1877); *Pocopson Road,* 16 Pa. 15 (1851); *Marinclin Appeal,* 204 Pa. Superior Ct. 552, 205 A. 2d 885 (1964); *Dickinson Township Road,* 23 Pa. Superior Ct. 34 (1903). The public's utilization of the improvements on Oak Spring Road and U.S. 19 will certainly be more immediate and dramatic than in the private road cases.[5]

In support of its allegation that the condemnation was not for an authorized public purpose, Washington Park relies in part upon an argument which when analyzed becomes a "chicken and egg" problem: it assumes that the widening of Oak Spring Road and the construction of Southgate are interrelated, that is, without Southgate the road would not be needed and without the road Southgate would not be built. The record contains testimony which casts considerable doubt upon the absoluteness of appellant's position,[6] but even

---

[5] Compare *Sturgill v. Commonwealth, Department of Highways,* 384 S.W. 2d 89 (Ky. 1964), where the court held that the taking of private land in order to provide an access road for a motel was for a public purpose.

[6] For example, a District Engineer for the Department of Highways testified the affected roads were already in need of constant repair and the subject of continuous complaints. Midway in the proceedings the road supervisors intervened and informed the court below that the unreconstructed intersection could not safely handle existing traffic. Moreover, in a petition filed in opposition to the granting of a supersedeas in the instant case, South Strabane Township, asserted that completion of the highway reconstruction was essential to the public safety of its citizens. See also note 4, supra.

if its premise was uncontested its conclusion would be a non sequitur. The Commonwealth's officials have an obligation to consider the future, as well as the present, needs of the community.[7] Whether or not Southgate generated the need for the work is immaterial, for Southgate could not exist if the community were unable to support it. Nor is the Commonwealth required to refrain from widening its roads simply to perpetuate Washington Park's favorable position at this location.

Indeed appellant's entire argument totally misconceives the extent of the public's interest in adequate highways: "The public character of the road does not depend upon the degree of public necessity or convenience that require it or the extent to which the public uses it, or the number of persons that it accommodates, and it is no legal objection that a proposed highway will be a *cul de sac,* or that it will lead to the residence or place of business of but one individual, for the public may desire to visit or do business with him. If a road is to be open for public travel the purpose for which the public may wish to travel is not material, and land may be taken by eminent domain for a road which is intended solely for driving for pleasure and recreation or to furnish a view of beautiful natural scenery. Streets are frequently laid out for the purpose of opening up private land, but if a street is to be open to public travel it is well settled that it is for the public use, although it is of especial convenience or advantage to certain individuals, or even if its sole or principal object is to enhance the value of the land through which it passes and the entire cost is met by special assessments on the land thus benefited. Land may be taken for widening existing highways even if the necessity of the widening is created by a railroad

---

[7] Compare *Oliver v. Clairton,* 374 Pa. 333, 342, 98 A. 2d 47, 52 (1953) ; *Valmont Developing Co. v. Rosser,* 297 Pa. 140, 149, 146 Atl. 557, 560 (1929).

corporation, and the railroad is required to pay the expense." 2 Nichols, Eminent Domain §7.512[1] (3d ed. 1963) (footnotes omitted).

Washington Park also characterizes the agreement between Southgate and the Commonwealth, mentioned above,[8] as an illegal one whose very existence tends to prove that the condemnation was for the benefit of a private commercial enterprise. However, the Act of June 1, 1945, P. L. 1242, §502, 36 P.S. §670-502, specifically states that it shall "be lawful for the department to enter into agreements, in the discretion of the secretary, with counties or townships or with persons, associations of corporations for sharing with the Commonwealth the cost of construction, reconstruction and maintenance of such highways, or parts thereof." While §502 of the Act of 1945, is limited to highways in the "Rural State highway system", Oak Spring Road, technically Legislative Route 62214, is part of that system by virtue of the Act of May 31, 1956, P. L. (1955) 1881, 36 P. S. §1738-2. The Secretary of Highways reasonably viewed the reconstruction of Oak Spring Road and Route 19 to be part of the same project. See Act of June 1, 1945, P. L. 1242, §210, 36 P.S. §670-210.

It is beyond dispute that Southgate would benefit immensely from the contemplated improvements and accordingly was directly interested in the progress of the Commonwealth's plans. However, the Commonwealth's ability, because of this interest, to defray a considerable portion of the cost in no way casts any doubt upon the legality of the taking. It is worth repeating the observation of the court below that "there was not one scintilla of evidence of fraud, corruption or misfeasance."

The order of the court dismissing Washington Park's preliminary objections must be affirmed, with-

---

[8] See p. 351-2, supra.

out prejudice to appellant's right to proceed to the ascertainment of its damages resulting from the taking.

We turn next to a consideration of the appeal of S. S. Kresge Company, a tenant in the Washington Park shopping center. The Commonwealth concedes it did not give Kresge notice as a condemnee under the Eminent Domain Code of 1964.[9] However, on the third day of the hearing, the trial court *sua sponte* notified Kresge and other affected tenants of the proceedings, and invited them to join as "objectors, intervenors, or to obtain relief at the foot of the decrees." When the hearings were resumed, after a five day recess, Kresge entered an appearance and requested that it be given thirty days in which to file its own preliminary objections. The trial judge refused to treat his notice as being equivalent to a notice of taking by the Commonwealth and denied the request. Thereupon Kresge informed the court that it would not participate in the proceedings.

Kresge contends that because the recorded memorandum of its lease with Washington Park, provided that it has an easement in the parking areas, common areas, roadways, sidewalks and accessways to the public streets and highways, it was entitled to formal notice as a condemnee. The Commonwealth, on the other hand, asserts that Kresge's rights in these areas do not amount to an easement and hence Kresge was not entitled to notice. We find it unnecessary to decide this issue.[10]

In light of what we have said in the first part of this opinion, we are frankly somewhat skeptical of

---

[9] Act of June 22, 1964, P. L. 84, §405, 26 P.S. §1-405 (Supp. 1966).

[10] Washington Park has also argued that the failure to give Kresge proper notice invalidates the taking *as to it*. We fail to see how the Commonwealth's failure to properly notify Kresge, if such notice was required, in any way prejudices Washington Park from adequately protecting *its* rights.

Kresge's claim that it "has defenses or evidence either not discovered by or not available to the landlord." Nevertheless we agree with Kresge that its appeal must be quashed because, if it was entitled to notice as a condemnee, the order of the court dismissing Washington Park's preliminary objections could not constitute a final and binding order against Kresge. Indeed the adjudication of the court below specifically disclaimed any such intention: "It is not necessary today to decide if the tenants still have the right to file preliminary objections of their own."[11]

Under the circumstances, Kresge's appeal in No. 235 March Term, 1966, is quashed.

In No. 225 March Term, 1966, the appeal of Washington Park, Inc., the order of the court below is affirmed.

Mr. Justice COHEN dissents.

DISSENTING OPINION BY MR. JUSTICE MUSMANNO:

The Highway Department of Pennsylvania has constructed at the taxpayers' expense a concrete white elephant in Washington County. At an asserted cost of some $500,000 it widened into a glistening boulevard a little country road only a half mile long. The road is so short that it ends its journey before it can make up its mind where to go. In its brief travel it visits a woodland, a trailer camp and a few modest houses, the occupants of which were thoroughly satisfied with road conditions as they were.

This rural passageway, known as Oak Spring Road, was adequate for the sparse traffic it bore. I visited

---

[11] On the same day as the opinion and order was filed dismissing Washington Park's preliminary objections, Kresge filed its own preliminary objections. No disposition has been made of Kresge's preliminary objections, or several related motions, inasmuch as the court below stayed all further proceedings pending the disposition of Washington Park's appeal.

this pleasant little rustic lane before it was blown up into a white elephant and noted that, in a period of an hour and a half, only one automobile traversed its asphalt surface.

In January, 1966, the Highway Department filed in the Court of Common Pleas of Washington County a declaration of taking, in anticipation of the widening, grading and repaving of Oak Spring Road, plus some work contemplated on U. S. Route 19. On February 21, 1966, the Washington Park, Inc., owner of a shopping center, abutting on Route 19 and converging at a point where it intersects with Oak Spring Road, filed preliminary objections, averring that the Secretary of Highways of the Commonwealth of Pennsylvania was without power to condemn property owned by Washington Park because Article I, §10 of the Constitution of Pennsylvania provides that private property may be taken for public use alone, whereas the project involved in the declaration of taking here was launched for the purpose of benefiting a private property owner, namely, the Southgate Shopping Center, Inc., owning property on Oak Spring Road which it intended to develop into a shopping center.

The preliminary objections stated also that the declaration of taking was misleading in that it appeared therefrom that the Commonwealth proposed to improve all of Oak Spring Road, whereas in fact it intended to reconstruct only that portion of the road which would confer a commercial advantage to Southgate. Washington Park asserted further that an agreement entered into between the Department of Highways and Southgate revealed that the taking was for private property because Southgate, being the direct beneficiary of the contemplated operation, agreed to pay all damages resulting from the condemnation of the Washington Park property. It asserted, in addition, that the Commonwealth, through an improper delegation of

sovereign authority, committed itself to appointing a special Commonwealth assistant attorney general to handle all proceedings relating to losses suffered by Washington Park.

The court of common pleas dismissed the preliminary objections and Washington Park appealed. While the appeal was pending, Washington Park applied to me for a supersedeas to halt the building of the road until this Court could hear the appeal and determine whether the serious averments of Washington Park had merit in law and in fact. It was apparent to me that unless the construction was halted, the Supreme Court would have nothing to pass on when the appeal would be heard in its September session, some two months hence. Washington Park averred that the construction contractors were working at top speed, including Saturdays, to complete the job so that it would be a *fait accompli* by the time the autumn leaves fell. Of course, it was as apparent to me as the sunrise, that, once the construction job was completed, the hearing before the Supreme Court would be an empty show, a hollow shout on the part of the attorneys, and the Court's decision would be an adjudication in a vacuum. Indeed the whole appellate procedure would be mockery. It would be like litigating the tide which has gone out, the light of the moon in eclipse, or the ownership of a horse that has leaped over a mile-high cliff.

Nothing can be more important in law than preservation of the *res,* the thing in controversy, until the Court decides its fate. If this multiple-hundred-thousand-dollar road was constructed before the appeal was heard, the solid concrete of which it would be made could not be melted and minted into dollars to put back into the pockets of the taxpayers from which the money had been taken. The time to decide whether a road should or should not be constructed was before

the steam shovels, bulldozers, and concrete mixers joined in a mighty welding operation to tie together in perpetual bond a solid structure that could never be reduced to its original elements again.

It also was quite clear to me that if the enterprise was not stopped and Washington Park should prevail in its appeal, its victory would be a Pyrrhic one, it would be gaining an empty well, a dry fountain, a breadless pantry, or the carcass of that horse that had jumped over the cliff.

Thus, on July 6, 1966, I granted the supersedeas. The Department of Highways ignored my order insofar as it appertained to Oak Spring Road. I called a hearing of the attorneys. Six appeared: Two for the Commonwealth, two from Washington Park, one for South Strabane Township (the site of Oak Spring Road) and the S. S. Kresge Company, a tenant of Washington Park. It developed at the hearing that no one would be inconvenienced nor would the business of South Strabane Township be interfered with, if all building operations on Oak Spring Road would cease until the legal matters in controversy would be decided by the Supreme Court. I, accordingly, reaffirmed my supersedeas and ordered the Highway Department to cease work on Oak Spring Road as well as on Route 19.

Now that everything was to be held in status quo, the remaining members of the Supreme Court, in a flagrant usurpation of power, overruled my supersedeas. The statute under which I had issued the supersedeas states specifically: "In appeals from judgments and decrees in mandamus, quo warranto, contested election cases, from sentences in criminal proceedings and all other classes of cases not herein otherwise provided for, the appeal shall not operate as a supersedeas, unless so ordered by the court below or the appellate court *or any judge thereof* either by general rule or

special order, and upon such terms as may be required by the court or *judge granting the order of supersedeas.*" (Emphasis supplied)

I am a Justice of the Supreme Court and the other Justices had not a shadow of authority to interfere with a right conferred on me by the Legislature. The statute is a wise expression of the will of the people. Of what use can it be for any litigant to appeal to the highest court of our State if in the meantime the very object, which is in litigation, is demolished?

If the Highway Department was of the belief that Oak Spring Road should have been improved, it could have launched that improvement during the preceding three years, but, having waited three years, it certainly could have waited another two months so that the Supreme Court could determine whether the Department had the right to contract, in the manner it did, for the controverted construction.

The Majority said, at the time, that I could grant supersedeas only as to the 1200 square feet of the complainant's property on Route 19, but it overlooked the undisputed fact that the whole construction project was one indivisible operation. The very heading of this case combines the construction on Oak Spring Road and the construction on Route 19 as one inseparable undertaking. The case was heard in the court of common pleas on the proposition that the construction project was not divisible. The Highways Department acted on the basis that the improvements on Oak Spring Road and Route 19 were inseparable and indivisible. In view of the constant, unbroken indivisibility of the project, the Majority had no right, especially without any intimate knowledge of the situation, to divide the project. The Majority broke eggs without knowing whether they were chicken or turkey eggs. It declared that it would later, if necessary, unscramble the resulting omelet, knowing full well it could never unscramble it.

Every consideration of the situation demanded that the status quo be maintained until the appeal was heard.

When the Majority of the Court improperly interfered with the supersedeas I had issued, I filed a Dissenting Opinion in which I said: "I stand ready to sit with my colleagues to hear the appeal immediately so that this question so important to taxpayers and the community involved be adjudicated without delay and thus prevent the possibility that an illegal condemnation, an illegal taking, an illegal construction, and an illegal expenditure of taxpayers' money be perpetuated without possibility of remedy or repair.

"No one is being harmed or can be harmed by the slight delay of a matter of two months until the appeal can be argued before the entire Court. The Majority is making this appeal impossible by ordering a destruction of the status quo. It is doing this not because it has the authority to do so, but in spite of the law which orders it not to do so. This is indeed a melancholy situation. The Majority is flouting statutory law, it is denying litigants due process, it is adjudicating without having an awareness of the facts, it is allowing the shoveling of taxpayers' dollars into road ditches which may later prove to have been illegally excavated."

As soon as my supersedeas was dissolved by the improper action of the Majority of this Court, the steam shovels, bulldozers, concrete mixers and all other road construction equipment went into high gear, and in a very short time, the short, modest Oak Spring Road found itself attired in a glistening concrete dress, with nowhere to go. The taxpayers' money was spent on this gala attire before there was an adjudication as to whether the money was authorized.

The appeal was finally heard and now the Majority has affirmed the action of the court below. It could

not do otherwise. It would be folly to order the destruction of $500,000 worth of road building. The concrete cannot be liquified and transmuted into gold to put back into the State's treasury.

Whether Southgate will now erect its shopping center no one knows, but the fact remains that Washington Park was denied due process because its property right was physically destroyed when the supersedeas was dissolved. It went through the motions of an appeal but the argument was a useless procedure. Its attorneys were pouring water on a wheel which had no shaft, they were carrying empty sacks into a deserted flour mill, they were boarding a gangplank after the ship had left, they were rolling the stones of Sisyphus. The law looked on as the attorneys bolted and locked the door, knowing all the time that there was no horse in the barn; the attorneys were drinking from a jug without a bottom, the cannoneers were firing cannon that had no powder. It was all a vain and useless thing.

The refusal to grant supersedeas can result in irreparable tragedy. Nicola Sacco and Bartolomeo Vanzetti, two workingmen in Massachusetts, were sentenced to death after a trial admittedly saturated with error. As one of the attorneys in the case I filed a petition for certiorari in the Supreme Court of the United States. The date of execution was set for August 22, 1927. The Supreme Court was not to meet until the following October. A stay of execution was imperative if the Supreme Court was to pass on living litigation. I applied to the Chief Justice and two Associate Justices of the Supreme Court, all of whom refused to grant the stay. I made application to the Governor of Massachusetts, he refused the stay. I turned to the President of the United States because by this time the Sacco-Vanzetti case had taken on international significance and the heads of many governments had in-

dicated they feared a great injustice would result if the two doomed workingmen went to the electric chair with half of the world believing them innocent. The President declined to intervene.

On August 22, 1927, the men, who were undoubtedly innocent, were executed. Two months later the Supreme Court met and one of the first items of its business was consideration of the pending petition for writ of certiorari, the one I had filed. The Court was formally advised that the petition was now moot because Sacco and Vanzetti were dead.

I believe it is a serious thing to refuse a supersedeas when, without it, the *res* may be destroyed, as it was in this case, when the bulldozers and concrete mixers went into action on the little Oak Spring Road in Washington County.