# IN THE COMMONWEALTH COURT OF PENNSYLVANIA

Gary D. Wolfe and Mary O. : 
Wolfe, husband and wife : 
  : 
     v. : 
  : 
Reading Blue Mountain and : 
Northern Railroad Company, : No. 649 C.D. 2022
            Appellant : 
  : 
In re: Condemnation of Lands of : 
Gary D. Wolfe and Mary O. Wolfe : 
Pottsville Pike, Muhlenberg Township : 
  : 
Appeal of: Reading Blue Mountain : No. 722 C.D. 2022
and Northern Railroad Company : Submitted: September 23, 2022

BEFORE:   HONORABLE RENÉE COHN JUBELIRER, President Judge
              HONORABLE ANNE E. COVEY, Judge
              HONORABLE LORI A. DUMAS, Judge

OPINION NOT REPORTED

MEMORANDUM OPINION BY
JUDGE COVEY                            FILED: November 14, 2022

Reading Blue Mountain and Northern Railroad Company (RBMN) appeals from the Berks County Common Pleas Court's (trial court) June 8, 2022 order sustaining Gary D. Wolfe and Mary O. Wolfe's (collectively, Wolfes) preliminary objections (Preliminary Objections) to RBMN's Amended Declaration of Taking (Declaration). RBMN presents five issues for this Court's review: whether the trial court erred by: (1) finding that RBMN did not take the Wolfes' property for a public purpose; (2) finding that RBMN effected a *de facto* taking of the subject property and another Wolfes-owned property; (3) finding that RBMN's taking was in bad faith; (4) dismissing RBMN's Declaration rather than ordering

RBMN to post sufficient security, where RBMN presented testimony regarding its line-of-credit as evidence of sufficient security; and (5) striking RBMN's Declaration, ordering revesting of the subject property's title to the Wolfes, and permitting the Wolfes to petition for counsel fees. After review, this Court reverses and remands.

On April 27, 2022, RBMN filed the Declaration, seeking to condemn a 0.0889-acre portion of the Wolfes' property located at 3901 Pottsville Pike, Muhlenberg Township, Pennsylvania (3901 Property). The Wolfes also own the adjoining property at 3907 Pottsville Pike (3907 Property) (collectively, Properties), at which their tenant, Wolfe Roofing A Tecta America Company, operates a commercial roofing company it purchased from the Wolfes. The Wolfes acquired both Properties by deed in 1982 from L.H. Focht & Sons, Inc.

In the early twentieth century, the Reading Company owned a portion of the Wolfes' Properties. At that time, a portion of the 3901 Property was part of a larger parcel of land that the Reading Company conveyed by deed in 1928 to G.W. Focht Stone Company (1928 Deed). The Reading Company operated a railroad and, as described in the 1928 Deed, the property had rail siding[1] running onto it.

The 1928 Deed contained two easements in favor of the Reading Company. The first easement is not at issue in this appeal. The second easement was for siding already existing on the property, but the easement required that the grantor and its successors would have to remove the siding within 90 days of demand by the grantee and its successors, the Wolfes. The existing siding was connected to the main railroad line by a single track that crossed State Route (SR) 61 (Crossing). The subject siding was on the 3901 Property when the Wolfes acquired it in 1982,

---

[1] "Rail siding is a low speed track section that stores, loads, or stables vehicles. Siding is distinct from a running line or a main line that is primarily used for the movement of tracks." Trial Ct. Op. at 2.

but RBMN ceased active use of the Crossing and siding on the 3901 Property after 1982. On January 15, 1998, the Public Utility Commission (PUC) suspended the Crossing due to lack of use. Thereafter, SR 61 was repaved, and the tracks were buried or destroyed.

On June 11, 2021, RBMN sought the PUC's approval to re-establish rail service over the Crossing. On October 20, 2021, the PUC granted RBMN's request. On April 4, 2022, the Wolfes' counsel notified RBMN that the Wolfes wanted the siding removed from the 3901 Property per the 1928 Deed easement termination provision. On April 15, 2022, RBMN's president informed the Wolfes that RBMN refused their demand and intended to move forward with its plan to once again use the siding at the 3901 Property. On April 20, 2022, the Wolfes filed a complaint and emergency motion for a preliminary injunction to prevent RBMN from unlawfully entering the 3901 Property. On April 21, 2022, the trial court enjoined RBMN from entering the Wolfes' 3901 Property pending a hearing on the Wolfes' emergency motion.

On April 21, 2022, RBMN filed a declaration of taking, and then, on April 27, 2022, filed the Declaration. According to the Declaration and exhibits attached thereto, RBMN plans to erect rail sidetracks on the 3901 Property and connect it to a reconstructed Crossing, to provide service to one of RBMN's customers, Berks County Russell Standard (Russell Standard), an asphalt plant related to SemMaterials Energy Partners LLC, which owns the property to the south of the Wolfes' Properties. On May 20, 2022, the Wolfes filed the Preliminary Objections, therein alleging that RBMN's taking was not for a public purpose, but rather for conferring an impermissible private benefit on Russell Standard. The Wolfes also asserted that RBMN's plan is a *de facto* taking of the Properties, since the Crossing will cut across the access point to the Properties and neighboring properties, and will landlock the 3907 Property. The Wolfes also contend that

3

RBMN's taking is a bad faith attempt to avoid the negotiated express easement terms, which require RBMN to remove the siding within 90 days of the Wolfes' demand. Finally, the Wolfes aver that RBMN failed to post sufficient security with the Declaration. On May 25, 2022, RBMN opposed the Wolfes' Preliminary Objections.

On June 2, 2022, the trial court held an evidentiary hearing on the Preliminary Objections. The trial court heard argument on June 3, 2022. On June 8, 2022, the trial court sustained each of the Preliminary Objections. The trial court also ordered that title to the 3901 Property be revested to the Wolfes, struck RBMN's Declaration, and directed the Wolfes' counsel to file a motion for counsel fees and costs. On June 17, 2022, RBMN filed a motion for reconsideration in the trial court, which the trial court denied on June 21, 2022. On July 8, 2022, RBMN appealed to this Court.[2] On July 21, 2022, the trial court issued its opinion (Opinion).

Initially, "[t]he Constitutions of the United States and Pennsylvania mandate that private property can only be taken to serve a public purpose. . . . [T]o satisfy this obligation, the public must be the primary and paramount beneficiary of the taking." *In re Opening a Private Rd. for Benefit of O'Reilly*, 5 A.3d 246, 258 (Pa. 2010) (citations omitted). A "taking does not 'lose its public character merely because there may exist in the operation some feature of private gain, for if the public good is enhanced it is immaterial that a private interest also may be benefited.'" *Appeal of Wash. Park, Inc.*, 229 A.2d 1, 3 (Pa. 1967) (quoting *Belovsky v. Redevelopment Auth. of the City of Phila.*, 54 A.2d 277, 283 (Pa. 1947)). "In a

---

[2] RBMN also filed a notice of appeal from the order granting the injunction, which was the lead docket number on the consolidated cases in the trial court. This Court consolidated the two appeals *sua sponte*. RBMN raises no issues herein with respect to the injunction appeal. "In an appeal from an eminent domain proceeding, our review is limited to determining whether the lower court abused its discretion or committed an error of law[,] or whether the findings of fact were supported by substantial evidence." *Szabo v. Dep't of Transp.*, 202 A.3d 52, 58 (Pa. 2019).

4

review of a decision to condemn property and of the extent of the taking, the trial court's scope is limited to determining whether the condemnor is guilty of fraud, bad faith, or an abuse of discretion." *Redevelopment Auth. of the City of York v. Bratic*, 45 A.3d 1168, 1173 (Pa. Cmwlth. 2012). "The burden of proving that the condemnor has abused its discretion is on the objector or condemnee, and that burden is a heavy one because, in such cases, there is a strong presumption that the condemnor has acted properly." *In re Condemnation No. 2 Cmwlth. ex rel. Dep't of Gen. Servs.*, 943 A.2d 997, 1002 (Pa. Cmwlth. 2007).

Section 1511 of the Business Corporation Law of 1988 (BCL) provides, in relevant part:

> (a) . . . . A public utility corporation[3] shall, in addition to any other power of eminent domain conferred by any other statute, have the right to take, occupy and condemn property for one or more of the following principal purposes and ancillary purposes reasonably necessary or appropriate for the accomplishment of the principal purposes:
>
> (1) The transportation of passengers or property or both as a common carrier by means of elevated street railway, ferry, inclined plane railway, railroad, street railway or underground street railway, trackless-trolley omnibus or by any combination of such means.

15 Pa.C.S. § 1511.

RBMN first argues that the trial court ignored the Wolfes' heavy burden of proof, and erred by finding that the taking was improper because it was not for a public purpose.

In sustaining the Preliminary Objections, the trial court explained:

---

[3] Section 1103 of the BCL defines "[p]ublic utility corporation," in relevant part, as "[a]ny domestic or foreign corporation for profit that: (1) is subject to regulation as a public utility by the [PUC] or an officer or agency of the United States[.]" 15 Pa.C.S. § 1103.

[T]h[e] [trial] court found that the condemnation was effectuated solely to benefit a single private commercial enterprise, Russell Standard, and as such, violated the prohibition on using eminent domain for private purposes. The power of eminent domain may only be exercised for a public purpose. This condemnation, based on the evidence, is at the behest of and for the sole use of Russell Standard, a single private entity. **The public does not benefit from [RBMN]'s condemnation in any way**. The public will buy Russell Standard's asphalt regardless of whether or not the needed materials arrive by rail or truck to Russell Standard's plant.

Russell Standard wants the railroad for the convenience of its manufacturing process. The only goods moved on the rail will be those bought by Russell Standard. [RBMN] will serve no other customers. [RBMN] will provide no public transportation. **Whatever public benefit may ensue from the condemnation**, **the land being taken is to be used for a private enterprise and as such is prohibited**. The presence of a public benefit, even if it were [sic] a significant one, cannot save what is otherwise an improper condemnation. *Pa. Mut. Life Ins. Co. v. City of Phila.*, . . . 88 A. 904 ([Pa.] 1913). To condemn land owned by the Wolfes, so Russell Standard can commercially profit from the land to the Wolfes' detriment serves a purely private, and thus, unconstitutional interest.

. . . . [I]n the instant case the condemnation sought is excessive to [RBMN]'s need to serve Russell Standard. It appears that [RBMN] is protecting Russell Standard's interest not to clutter its property with tracks where the rail cars could sit indefinitely until the products are needed. Instead, it intends to clutter [the] Wolfes' property.

Trial Ct. Op. at 12-13 (emphasis added).

With respect to the Wolfes' burden, the Pennsylvania Supreme Court long ago emphasized:

[T]he rule is that ["]the burden of showing the company is exercising franchises which it does not possess is on those alleging that [the corporation] is attempting to do what it is not authorized to do - construct a railroad for purely

6

private purposes.["] *Deemer v. Bells Run R.R. Co.*, . . . 61 A[.] 1014 [(Pa. 1905)]. **The corporate directors have power to decide as to the location of**, and public **necessity for, an extension of any part of the road**, be it **a branch or otherwise**, and it is to be assumed, unless **the contrary is plainly shown**, that such officials, like **all other officials**, have performed their duty in good **faith**, when they declare a public necessity for an extension, or when they designate it as a branch.

*Pioneer Coal Co. v. Cherrytree & Dixonville R.R. Co.*, 116 A. 45, 48 (Pa. 1922) (emphasis added; citation omitted).

Regarding public use/public purpose, the *Pioneer Coal* Court explained:

What constitutes public use is a point not free from difficulties, but **wherever it appears from the attending circumstances that a section of road about to be constructed will in some direct way tend to contribute to the general public welfare**, or the welfare of a **considerable element of the public**, it cannot be said **that it will not serve a public use**. This principle is now too well established in Pennsylvania to be questioned. Here, conceding that **the extension under discussion will be largely employed to take coal from the** . . . [c]ompany's properties, yet, since it must also be **conceded that the life**, happiness and prosperity of the **people of Pennsylvania depend to a very large degree upon getting the coal supply of the** [s]tate out of the **mines, [and] on its way to the consumer**, this in itself, **on the facts at bar**, stamps a project as that before us **as one for public use sufficiently to justify the exercise of the right of eminent domain**.

*Id.* (emphasis added; citations omitted).

Further,

"it is not the special use made [of a section of road] which characterizes it [as a part of the public road], but its convenient necessity to that part which is [undeniably] for public use." *P*[*hila*]*., W*[*ilmington*] *& B*[*alt.*] *R.R. Co. v.*

7

*Williams*, 54 Pa. 103, 107 [(1867)].[4]  Finally, **the mere fact that some selfish interest may have inspired the plan for the part in controversy in no sense prevents that section from being classed as a "branch" road**, **or for public use**.[5]

---

4    **The sidetrack** . . . **when connected with The Pennsylvania Railroad**, **constituted a part of the railroad's transportation facilities** . . . .  The railroad's right[-]of[-]way and tracks are its private property, but **subject to public use**.  If some of these facilities constituting its transportation system are privately owned, **they are none the less** [sic] **charged with public use**, and subject to regulation by the state.  Sidetracks are among the works and appendages usual in the convenient operation of a railroad; they are facilities of such utility, even though privately owned; **when connected with the line of the railroad company they are an integral part of the railroad system**, **regardless of ownership**, **and** . . . **become public highways**, **and hence subject to regulation as such by the state**.

*Pa. R.R. Co. v. Pa. Pub. Util. Comm'n*, 35 A.2d 584, 586 (Pa. Super. 1944) (emphasis added) (quoting *Lehigh Navigation Coal Co. v. Pa. Pub. Util. Comm'n*, 1 A.2d 540, 544 (Pa. Super. 1938) (citation omitted)).

[5] More recently, this Court explained:

Section 102 of the Public Utility Code . . . defines railroad as "[e]very railroad, other than a street railway, by whatsoever power operated, for public use in the conveyance of passengers or property, or both, and all the facilities thereof."  66 Pa.C.S. § 102.  The federal Interstate Commerce Act[, 49 U.S.C. §§ 10101-11917,] defines "railroad" to include "a switch, spur, track, terminal, terminal facility, and a freight depot, yard, and ground, used or necessary for transportation."  49 U.S.C. § 10102(6)(C).  "[A] track leading from the main line of a railroad is variously described as a 'switch,' a 'siding,' a 'spur' or a 'branch.'"  *Erie & W[yo.] V[alley] R.[R.] Co. v. Pub[.] Serv[.] Comm'n*, 74 Pa. Super. 338, 345 . . . ([] 1919).

. . . .  The [r]ail [s]pur will be used in conjunction with the main railroad to load and unload rail cars.  Although the proposed [r]ail [s]pur is private, **it is part of the railroad**, **which is a public use**.  *See Rogoff v. Buncher Co*., . . . 151 A.2d 83 ([Pa.] 1959) (holding a private siding is part of a railroad system).

*Choice Fuelcorp, Inc. v. Zoning Hearing Bd.* (Pa. Cmwlth. No. 1515 C.D. 2012, filed May 16, 2013), slip op. at 12 (emphasis added).  Unreported decisions of this Court, while not binding, may be cited for their persuasive value.  Section 414(a) of the Internal Operating Procedures of

*Pioneer Coal*, 116 A. at 48 (emphasis added).

Subsequently, in *C.O. Struse & Sons Co. v. Reading Co.*, 153 A. 350 (Pa. 1931), the Pennsylvania Supreme Court addressed a contested taking in which the Reading Railroad attempted to appropriate the plaintiff's land to rebuild a branch road to Sears Roebuck & Company's (Sears) facility for the purpose of facilitating merchandise shipments. The *C.O. Struse* Court stated: "The right to build branch railroads . . . has been many times affirmed by th[e Pennsylvania Supreme C]ourt." *Id*. at 352. The *C.O. Struse* Court referenced *Pioneer Coal*, and other decisions, summarizing:

> In *Getz's Appeal*, 10 Wkly. Notes Cas. 453 [(__)], **the right of a railroad company to construct a branch to connect with a rolling mill** was sustained. **The right to maintain a branch railroad used only to transport freight from a manufacturing plant was sustained** in *Rudolph v. [Pennsylvania] S[chuylkill] Val[ley] [Railroad] [Co.], . . .* 31 A. 131 [(Pa. 1895)]. **A branch or spur track may constitute a part of the railroad's transportation facilities although when constructed it may lead only to a single industry**.[6] *Union Lime Co. v. Chicago [&] N[w.]*

the Commonwealth Court, 210 Pa. Code § 69.414(a). *Choice Fuelcorp* is cited for its persuasive value.

6    However [a siding constructed by the railroad upon its right-of-way] may have been constructed primarily to accommodate some individual shipper; its use cannot be refused to others similarly situated, and under like conditions. Any shipper then or thereafter doing business at any point on the line of the siding could not be denied, under like conditions, equal facilities with those allowed another. **It is none the less** [sic] **devoted to public use because of the fact that it was constructed primarily for the convenience of a single shipper**. It must be open to all, and **becomes quite as much impressed with public use as any other track of the company**.

*Stoneboro & Chautauqua Lake Ice Co. v. Lake Shore & Mich. S. Ry. Co.*, 86 A. 87, 87 (Pa. 1913) (emphasis added).

> **Once constructed**, **the siding is impressed with a public use which may not be derogated from by prior agreement with**

*R*[*y.*] *Co*[.], 233 U.S. 211 [(1914) (railroad track connecting to two quarries)]. *See also* [*Borough of*] *Bethlehem v. Lehigh & N*[*ew*] *E*[*ngland*] *R.R. Co.*, 253 Pa. 251 [(1916) (railroad track connecting to a chemical company)]; *McAboy's App*[*eal*], 107 Pa. 548 [(1884)]. **In the construction of a branch the railroad company has the same power of eminent domain as in building the main line**. *Mayor, etc., of Pittsburgh v. The P*[*a.*] [*R.R.*] *Co.*, 48 Pa. 355 [(1864)]. **There is no controlling distinction between a coal mine or manufacturing plant which serves the public and a merchandise establishment**, **which does the same**. Moreover, Sears[] [is] engaged or [is] about to engage in the manufacture of paints on a large scale for commercial purposes.

*C.O. Struse*, 153 A. at 352 (emphasis added).

RBMN contends that its taking, here, similarly serves a public purpose. It claims that it is "reconstructing a siding in order to serve a customer who [sic] provides goods, namely, asphalt, to the public [and that] the [railroad] tracks [will be used] for the same purpose as they were used for in the past when the siding was last active - i.e., transporting asphalt f[ro]m the Russell Standard property." RBMN Br. at 19. Russell Standard, an asphalt plant, is not unlike the coal mine in *Pioneer Coal*, the Sears merchandise establishment serving the public in *C.O. Struse*, and the manufacturing plant, lime quarries and chemical plant addressed in the cases cited therein. Consistent with *Pioneer Coal* and the Pennsylvania Supreme Court's statements in *C.O. Struse* that "[a] branch or spur track may constitute a part of the

---

**private parties**. **The fact that private parties**, **in order to induce its construction for their own convenience**, **contributed part or all of its cost is of no significance**; nor would it alter the case in the slightest were it shown that, but for such contribution, the siding would not have been built. **The controlling fact is that it was built**, **and built by the railroad company**, **the only party having the right to build it**, **only**, **however**, **as a trustee of franchises committed to it by the** [s]tate, **to be exercised for the public benefit with preference to none**.

*Id*. at 88 (emphasis added).

railroad's transportation facilities although when constructed it may lead only to a single industry[,]" and "[t]here is no controlling distinction between a coal mine or manufacturing plant which serves the public and a merchandise establishment, which does the same[,]" *C.O. Struse*, 153 A. at 352, and given the "strong presumption that the condemnor has acted properly[,]" *In re Condemnation No. 2*, 943 A.2d at 1002, this Court agrees and concludes that RBMN's condemnation is for a public purpose and, thus, the trial court erred by sustaining the Wolfes' Preliminary Objection on the basis that RBMN did not take the 3901 Property for a public purpose.

RBMN next argues that the trial court erred by sustaining the Wolfes' Preliminary Objection that a *de facto* taking occurred[7] with respect to both the 3901 Property and the 3907 Property.

Addressing similar circumstances, this Court previously stated:

> Such a claim was not required to be, **nor should it have been**, **raised by preliminary objection**. *In re Condemn[nation] by Dep't of Transp., of Right[-]of[-]Way for State Route 79, Section W10, a Ltd. Access Highway, in the Twp. of Cecil,* . . . 798 A.2d 725, 732 ([Pa.] 2002) ([]*Sluciak*[]).
>
> In *In re Condemnation by County of Allegheny* ([]*Appeal of Keith*[]), 861 A.2d 387, 392 (Pa Cmwlth. 2004), **we rejected as improper the owners' procedural decision**

---

[7] A *de facto* taking occurs when an entity that is clothed and vested with the power of eminent domain substantially deprives property owners of the use and enjoyment of their property. In such proceedings, property owners must establish that they were deprived of the use and enjoyment of their property and that this deprivation was a direct and necessary consequence of actions taken by the governmental entity.

*Newman v. Dep't of Transp.*, 791 A.2d 1287, 1289 (Pa. Cmwlth. 2002) (citation omitted; italics added). "Speculative and conjectural harms are insufficient to show the substantial deprivation of use and enjoyment necessary to a *de facto* taking claim." *McMaster v. Twp. of Bensalem*, 161 A.3d 1031, 1037 (Pa. Cmwlth. 2017).

**to file preliminary objections to a declaration of taking alleging that a partial *de jure* condemnation resulted in a larger *de facto* taking of their property**. The Court held that **raising the issue of a *de facto* taking in that manner was improper because the owners were seeking a judicial determination of the value of their property after condemnation**, **which is not a judicial function**. Instead, the owners "are entitled to the difference between the fair market value of their property before and after the condemnation, both values to be fixed by a jury of view or traverse jury on appeal; they are not entitled to a judicial determination that their property has no value after the take." *Id*. [(citing *In re N. Huntingdon by N. Huntingdon Twp. Mun. Auth. for Sewerage Purposes* . . . 387 A.2d 183, 183-84 ([Pa. Cmwlth.] 1978))]. **In other words**, "[a] *de jure* condemnation [for a partial acquisition] cannot be converted to a *de facto* condemnation by an averment in a preliminary objection to a declaration of taking that the effect of the *de jure* condemnation was to render the property valueless**." *Appeal of Keith*, 861 A.2d at 392.

*2800 N. Broad St., LLC v. Commonwealth*, 259 A.3d 1022, 1027 (Pa. Cmwlth. 2021) (emphasis added). Similarly, here, it was improper for the Wolfes to raise, and error for the trial court to sustain, a preliminary objection that the "partial *de jure* condemnation resulted in a larger *de facto* taking of [the Wolfes'] [P]ropert[ies]." *Id*. Thus, the trial court erred by sustaining the Wolfes' Preliminary Objection raising a *de facto* taking.

Next, RBMN argues that the trial court erred by concluding the condemnation was made in bad faith.

Regarding bad faith, this Court has explained:

[P]ublic officials are presumed to act lawfully and in good faith. [*In re Condemnation by City of Phila. of Leasehold of Airportels, Inc.*], . . . 398 A.2d 224 ([Pa. Cmwlth.] 1979). Where the right of eminent domain is vested in a municipality, administrative body, **or even a private corporation**, the question as to whether the circumstances justify the exercise of the power in a specific instance is

12

> not a judicial one, at least in the absence of fraud or . . .
> bad faith. *Schenck v. Pittsburgh*, . . . 70 A.2d 612 ([Pa.]
> 1950). . . .

*Fleet v. Redevelopment Auth. of the Cnty. of Wash.*, 607 A.2d 311, 312 (Pa. Cmwlth. 1992) (emphasis added); *see also York City Redevelopment Auth. of City of York v. Ohio Blenders, Inc.*, 956 A.2d 1052 (Pa. Cmwlth. 2008). "Bad faith requires a tainted or fraudulent motive . . . [and must be proved] by clear, precise and indubitable evidence." *In re Condemnation of Land at Rear of 700 Summit Ave. Jenkintown Pa.*, 95 A.3d 946, 950 n.10 (Pa. Cmwlth. 2014). *See also In re Condemnation by the Redevelopment Auth.*, 682 A.2d 1369, 1372 (Pa. Cmwlth. 1996) ("It is a condemnee's burden to show bad faith and this cannot be done merely by bald assertions. Bad faith must be described by clear averments of fact in the pleadings and proved by clear, precise and indubitable evidence.").

The law is well established:

> "[A] trial court is limited in its review of a decision to condemn property and of the extent of the taking to determining whether the condemnor is guilty of fraud, bad faith, or has committed an abuse of discretion." *Appeal of Waite*, . . . 641 A.2d 25, 28 ([Pa. Cmwlth.] 1994). . . .

Moreover,

> [a] court has 'no power to substitute [its] discretion for that of the [condemnor], nor to correct mistakes in judgment. It is presumed that the officials have performed their duties in good faith. . . .' *Swartz v. Pittsburgh Pub*[.] *Parking Auth*[.], . . . 439 A.2d 1254, 1256 ([Pa. Cmwlth.] 1981). Mere evidence that a decision is unwise will not warrant a conclusion that a condemnor has abused its discretion in its selection of a site.

> *Downingtown Area Sch. Dist. v. DiFrancesco*, . . . 557 A.2d 819, 821-22 ([Pa. Cmwlth.] 1989).

*In re Condemnation by Commonwealth of Pa. Dep't of Transp., of Right-of-Way of State Route 0443, Section 02S, in Twp. of Mahoning* (*Twp. of Mahoning*), 255 A.3d 635, 644 (Pa. Cmwlth. 2021).

> Further,

> a taking must be for an authorized use, follow a "suitable investigation leading to an intelligent, informed judgment[,]" and be a "well-developed plan of proper scope[.]" [*Middletown Twp. v. Lands of Stone*, 939 A.2d 331, 338 (Pa. 2007)]. However, a condemnor "is not required to follow any set criteria in choosing a . . . site. All that is required is that an investigation be conducted so that the decision to condemn is an informed judgment." *Downingtown Area Sch. Dist.*, 557 A.2d at 822.

*Twp. of Mahoning*, 255 A.3d at 644-45.

> There is no requirement that a condemnor conduct a suitable investigation **specific to an alternative condemnee-requested proposal**. Rather, the requirement that a condemnor conduct a suitable investigation applies to the project itself. While that may include consideration of an alternate proposal, nothing mandates the level of consideration that must be given thereto. A **condemnor's plan** must be for a "proper purpose[,]" and "evidence of a well-developed plan of proper scope is significant proof that an authorized purpose truly motivates a taking." *Middletown Twp.*, 939 A.2d at 338. But a condemnor "is not required to follow any set criteria in choosing a . . . site. All that is required is that an investigation be conducted so that the decision to condemn is an informed judgment." *Downingtown Area Sch. Dist.*, 557 A.2d at 822.

*Twp. of Mahoning*, 255 A.3d at 651.

Here, in concluding that RBMN condemned the 3901 Property in bad faith, the trial court reasoned:

> [RBMN] wanted to condemn [the] [] [3901 P]roperty to benefit its private customer, Russell Standard. Unquestionably, the entry to and egress from Russell

14

Standard could be moved southward and only affect Russell Standard's property. [RBMN] refused to do this, claiming it did not want the expense to do so; however, it did not care how much money the Wolfes had to expend to enjoy the use of their [Properties] or how much damages it had to pay the Wolfes.

[RBMN's Vice President of Asset Management Matthew] Johnson [(Johnson)][,] testified that [RBMN] never contemplated not moving forward with the railroad activation on [the 3901 P]roperty. Thus, it never even considered an alternative route when it realized [the] Wolfes opposed the condemnation. [RBMN's land development expert, Michael] Bercek [(Bercek)] did not even do a cost analysis on moving the gate southward onto Russell Standard's property. Thus, th[e] [trial] court found that [RBMN] acted in bad faith in condemning [the] [] [3901 P]roperty.

This [trial] court specifically asked, . . . "why isn't it moved south even more on-" [Reproduced Record (R.R.) at 385a] "-on the other, Russell Standard [property]?" [*Id.*] [RBMN] counsel gave a two-part explanation in answer to the very question that, if not obvious to everyone, was the paramount question to which th[e] [trial] court needed an answer. The first prong was answered and, thus, discussed in detail in this ruling. Th[e] [trial] court understands that it is maybe too expensive to relocate the track directly into Russell Standard and that a redo application to the [] PUC would need to be done. But [RBMN] will need to perform significant construction to lay new track regardless. Again, th[e] [trial] court is disappointed with part one because no cost was provided for relaying track in the easement compared to relaying track directly into Russell Standard. Part II of the answer is dumbfounding: "and that also would not work for Russell Standard's purposes." [R.R. at 385a].

Th[e] [trial] court's only conclusion that can be logically drawn from this non-answer is that Russell Standard does not want railroad tracks blocking access to and from its property, just as [the] Wolfes do not! In other words, the very problems that [the] Wolfes object to suffering and, as testified to, the very reason they have cancelled the

15

easement and oppose this condemnation are for the very business interference reasons that are objected to by Russell Standard. That is why it would not work for Russell Standard's purposes. That reason must be so strong for Russell Standard, it is a deal breaker. Otherwise, [RBMN]'s counsel would have totally answered th[e] [trial] court's question as required.

Trial Ct. Op. at 15-17.

RBMN asserts that it had legitimate reasons for condemning the 3901 Property and conducted an appropriate investigation to be sufficiently informed, and thus, its taking is not in bad faith. Specifically,

RBMN conducted multiple site visits, R.[R. at] 527a-[5]28a, RBMN planned to use existing railroad tracks and easements before the Wolfes revoked RBMN's easement rights and filed an injunction, precluding RBMN's access to the [3901 Property], R.[R. at] 401a[,] 45a, and RBMN's expert provided salient reasons why the tracks could not be moved onto the Russell Standard [p]roperty, namely, because moving the [C]rossing would result in construction issues with existing utility lines and would require unreasonable expense to RBMN where it already had existing structures it could utilize. R.[R. at] 485[a].

RBMN Br. at 39.

RBMN's witness Bercek testified regarding the reasons for choosing the easement location and the difficulties in relocating the Crossing:

[Y]ou can see along where they have the proposed siding coming in to the Russell Standard property, just lying on the north side of that track is a fire hydrant.

. . . .

[The Wolfes' proposal to move the [C]rossing further south would require] relocating that.

Just from a safety perspective using that fire hydrant in an emergency situation, the proximity to the proposed line there is certainly an issue. You can move the standards back, but then you're dealing with the underlying utilities

16

in [SR] 61. Typically because of the load that you're crossing [SR] 61 with, they would typically encase those utilities in concrete. You have sewer, you have water, you have gas, you have electric. They're encased currently underneath the existing crossing. You'd have to go through that whole process again. So the complexity is you're dealing with authorities, townships, [the Pennsylvania Department of Transportation], the PUC, because you then have to, I'm assuming, open a new permit, and you know, repermit that site as a crossing.

R.R. at 484a-485a. Bercek further testified that moving the Crossing would be "a very complex task" and "[c]ertainly expensive." R.R. at 487a.

This Court concludes that the unrefuted record evidence demonstrates RBMN's proper purpose for the condemnation of the 3901 Property, that RBMN conducted a suitable investigation into the project's location, and that there is no clear, precise and indubitable record evidence to support the Wolfes' argument or the trial court's ruling that RBMN acted in bad faith. The trial court's review of a decision to condemn property is limited. *Appeal of Waite*, 641 A.2d at 28. Here, the trial court exceeded its authority by injecting its opinion on the proper location for the project over that of the condemnor, and based its ruling thereon.[8]

---

[8] The Wolfes assert that

> [RBMN's] brief mischaracterizes [the Wolfes'] bad faith argument in its entirety. The issue is not whether it is bad faith that [RBMN] did not implement an alternate route, nor is the issue whether [RBMN] met with [the Wolfes] on more than one occasion to discuss its plans. Simply put, [RBMN]'s taking is in bad faith because it is an attempt to willfully violate an agreement between the parties (one made by their predecessors-in-title) as set forth in the 1928 Deed.

Wolfes' Br. at 23. This Court notes that

> [a] state (and, of course, a county) cannot by contract divest itself of its power of eminent domain[;] that is, to take private property for public use upon payment of just compensation to the owner. The power of eminent domain is 'so inherently governmental in

17

Accordingly, the trial court erred by sustaining the Wolfes' Preliminary Objection alleging bad faith.

Finally, RBMN contends that the trial court erred by sustaining the Wolfes' Preliminary Objections and dismissing the Declaration for failure to post sufficient security. Section 303 of the Eminent Domain Code[9] (Code) provides:

> (a) Bond. -- Except as provided in subsection (b), every condemnor shall give security to effect the condemnation by filing with the declaration of taking its bond, without surety, to the Commonwealth for the use of the owner of the property interests condemned, the condition of which shall be that the condemnor shall pay the damages determined by law.
>
> . . . .
>
> (c) Insufficient security. -- **The court**, **upon preliminary objections of the condemnee** . . . , **may require the condemnor to give bond and security as the court deems proper if it appears to the court that the bond** . . . **of the condemnor is insufficient security**.

26 Pa.C.S. § 303(a),(c) (emphasis added).

RBMN presented into evidence a letter from Fulton Bank that it had $100,000.00 in a bank account, *see* R.R. at 183a, and Johnson's affidavit and testimony that RBMN had a $10 million line-of-credit.[10]

---

character and so essential for the public welfare' as not to be susceptible of abridgement by agreement.

*Condemnation of 110 Wash. St., Borough of Conshohocken, Pa. by the Redevelopment Auth. of the Cnty. of Montgomery*, 767 A.2d 1154, 1159 (Pa. Cmwlth. 2001) (quoting *Chesapeake & Ohio Ry. Co. v. Greenup Cnty.*, 175 F.2d 169, 172 (6th Cir. 1949) (citations omitted)). If the easement could not have divested RBMN of its condemnation power, RBMN's failure to comply with the terms of the 1928 Deed (and the easement contained therein) when it condemned the 3901 Property cannot serve as the basis for bad faith allegations.

[9] 26 Pa.C.S. §§ 101-1106.

[10] However, on cross examination, Johnson admitted that he did not know how much of that $10 million line-of-credit was available. *See* R.R. at 472a-473a.

18

The trial court concluded that RBMN's security was insufficient, stating:

> The only evidence regarding the sufficiency of surety is [] Johnson's testimony, and [] Johnson does not even know how much of the $10 million line[-]of[-]credit from Fulton Bank is presently available. [RBMN] has other lawsuits pending, so conceivably some or even a significant portion of the line[-]of[-]credit has been depleted. The $100,000.00 in [RBMN]'s bank account may be inadequate for all of its business needs. Significantly, [] [RBMN]'s line[-]of[-]credit letters from Fulton Bank were never admitted into evidence by [RBMN].
>
> [The] Wolfes' [Properties] alone, using the Berks County Assessment Office [(Tax Office)] calculations,[11] [are] valued at $289,728.00.[12] This valuation does not take into consideration the rental value of the [Properties] and the value of its structures. For these reasons, th[e] [trial] court found the sufficiency of the security to be inadequate.

Trial Ct. Op. at 13-14.

---

[11] RBMN contends that the Wolfes failed to meet their burden because the only evidence of the Properties' value was as provided by the Tax Office, and pursuant to Section 1105(4) of the Code, 26 Pa.C.S. § 1105(4), such evidence is explicitly inadmissible.

Section 1105(4) of the Code states:

> **At the hearing before the viewers or at the trial in court on appeal**:
>
> . . . .
>
> (4) The assessed valuations of property condemned shall not be admissible in evidence for any purpose.

26 Pa.C.S. § 1105(4) (emphasis added). Contrary to RBMN's contention, Section 1105(4) of the Code does not preclude the use of a property's assessed value for purposes of a trial court's consideration of a preliminary objection to a security's sufficiency but, rather, prohibits the use of such evidence "[a]t the hearing before the viewers or **at the trial in court on appeal**[,]" *i.e.*, at the valuation stage. *Id*. (emphasis added).

[12] The trial court's reference to $289,728.00 represents the combined land values of the 3901 Property and the 3907 Property. According to the Tax Office, the 3901 Property's land alone is assessed at $100,800.00. *See* R.R. at 333a.

19

Here, because the Wolfes established the 3901 Property's value and raised a legitimate question regarding the availability of the full $10 million line-of-credit, the trial court properly concluded RBMN's security was insufficient. However, instead of having dismissed the Declaration, pursuant to Section 303(c) of the Code, the trial court should have "require[d] [RBMN] to give bond and security as the [trial] court deems proper . . . ." 26 Pa.C.S. § 303(c). Accordingly, this issue is remanded and the trial court is directed to determine the amount RBMN is to provide as proper security, and direct RBMN to provide such security.

For all of the above reasons, the trial court's order is reversed and the matter is remanded to the trial court to determine the amount RBMN is to provide as proper security, and direct RBMN to provide such security.[13]

_____
ANNE E. COVEY, Judge

Judge Fizzano Cannon and Judge Wallace did not participate in the decision in this case.

---

[13] Because the trial court erred by sustaining the Wolfes' Preliminary Objections, the trial court also erred by ordering that the 3901 Property's title be revested to the Wolfes and that the Wolfes are entitled to recover counsel fees and costs.

# IN THE COMMONWEALTH COURT OF PENNSYLVANIA

Gary D. Wolfe and Mary O.         :
Wolfe, husband and wife          :
                                     :
        v.                    :
                                     :
Reading Blue Mountain and      :
Northern Railroad Company,    :   No. 649 C.D. 2022
              Appellant      :
                                     :
In re: Condemnation of Lands of  :
Gary D. Wolfe and Mary O. Wolfe :
Pottsville Pike, Muhlenberg Township :
                                     :
Appeal of: Reading Blue Mountain :   No. 722 C.D. 2022
and Northern Railroad Company   :

## O R D E R

AND NOW, this 14th day of November, 2022, the Berks County Common Pleas Court's (trial court) June 8, 2022 order sustaining the preliminary objections of Gary D. Wolfe and Mary O. Wolfe is REVERSED, and the matter is REMANDED to the trial court to determine the amount Reading Blue Mountain and Northern Railroad Company (RBMN) is to provide as proper security, and direct RBMN to provide such security.

Jurisdiction is relinquished.

_____
ANNE E. COVEY, Judge