**[J-10A-2024 and J-10B-2024]**
**IN THE SUPREME COURT OF PENNSYLVANIA**
**MIDDLE DISTRICT**

**TODD, C.J., DONOHUE, DOUGHERTY, WECHT, MUNDY, BROBSON, McCAFFERY, JJ.**

| | | |
|---|---|---|
| GARY D. WOLFE AND MARY O. WOLFE, HUSBAND AND WIFE, | : | No. 73 MAP 2023 |
| | : | |
| | : | Appeal from the Order of the |
| Appellants | : | Commonwealth Court at No. 649 CD |
| | : | 2022, entered on November 14, |
| | : | 2022, Reversing and Remanding the |
| v. | : | Order of the Berks County Court of |
| | : | Common Pleas, Civil Division, at No. |
| | : | 22-03762, entered on June 8, 2022. |
| READING BLUE MOUNTAIN AND | : | |
| NORTHERN RAILROAD COMPANY, | : | ARGUED: April 9, 2024 |
| | : | |
| Appellees | : | |
| | | |
| IN RE: CONDEMNATION OF LANDS OF | : | No. 74 MAP 2023 |
| GARY D. WOLFE AND MARY O. WOLFE | : | |
| POTTSVILLE PIKE, MUHLENBERG | : | Appeal from the Order of the |
| TOWNSHIP | : | Commonwealth Court at No. 722 CD |
| | : | 2022, entered on November 14, |
| | : | 2022, Reversing and Remanding the |
| APPEAL OF: GARY D. WOLFE AND MARY | : | Order of the Berks County Court of |
| O. WOLFE, HUSBAND AND WIFE | : | Common Pleas, Civil Division, at No. |
| | : | 22-03847, entered on June 8, 2022. |
| | : | |
| | : | ARGUED: April 9, 2024 |

**OPINION**

**JUSTICE DOUGHERTY**                    **DECIDED: August 20, 2024**

We granted discretionary review to consider whether the Commonwealth Court correctly determined a railroad company's taking of private property by eminent domain was for a public purpose, and thus allowed by applicable law. We conclude the record belies the appellate panel's holding, and the trial court correctly ruled the condemnation

was unlawful because it was intended to benefit a single private business rather than the public. We therefore reverse the Commonwealth Court's decision and remand for reinstatement of the trial court's order dismissing the condemnation action.

I.

Appellants Mary and Gary Wolfe (the Wolfes) are the owners of 3901 and 3907 Pottsville Pike in Muhlenberg Township (the Property). Appellee Reading Blue Mountain and Northern Railroad Company (RBMN) is the successor to the Reading Company, which once owned the Property, as well as additional parcels — 3915, 3921, and 3923 Pottsville Pike — all of which are now owned by the Wolfes.[1] When the Reading Company — which operated a railroad — sold the land to the Wolfes' predecessor, L.H. Focht & Sons, it maintained two easements over the Property. These easements were reflected in a 1982 deed, and allowed the Reading Company to continue to use the existing rail siding located on the Property.[2] The siding was connected to the main railroad line by a single track that crossed State Route 61 (the crossing). Importantly, the easements contained a termination provision requiring the grantor (Reading Company) or its successors (RBMN) to remove the siding within ninety days upon demand by the grantee or its successors (the Wolfes).

Reading Company ceased active use of the crossing and siding in the late 1980s or early 1990s. The Public Utility Commission (PUC) suspended the crossing for lack of use in January 1998. State Route 61 was repaved and the siding connector track was buried or destroyed. More than twenty-three years later, on June 11, 2021, RBMN sought

---

[1] The Property is improved with a building that houses a roofing business, under a lease with the Wolfes. The other parcels owned by the Wolfes contain three homes leased to three different families, and a self-storage business of approximately seventy units.

[2] "Rail siding is a low speed track section that stores, loads, or stables vehicles. Siding is distinct from a running line or a main line that is primarily used for the movement of tracks." Trial Court 1925(a) Opinion, 7/27/22 at 2.

PUC's approval to reestablish rail service over the crossing. PUC granted RBMN's request on October 20, 2021. When the Wolfes became aware of RBMN's plans, they instructed RBMN to remove the siding from the Property per the deed's easement termination provision. RBMN refused to comply and informed the Wolfes it intended to move forward with its plans. The Wolfes filed a complaint and emergency motion for preliminary injunction in the Berks County Court of Common Pleas, and on April 21, 2022, the court enjoined RBMN from entering the Property pending a hearing.[3]

RBMN subsequently filed a declaration of taking, seeking to condemn a 0.0889-acre portion of the Property. An amended declaration claimed the "primary purpose" of RBMN's condemnation was "to promote the health, safety and general welfare of the Commonwealth of Pennsylvania by serving the public need to have goods transported via rail[,]" and that the condemnation would "further that purpose by connecting sidetrack to the crossing, as approved by the [PUC], pursuant to RBMN's project plan **to provide rail services to the business** located on Route 61, Pottsville Pike, Reading, Pennsylvania as permitted in 15 Pa.C.S.A. §1511, 26 Pa.C.S.A. §204(b)(2), including (b)(2)(i) and (b)(2)(ii)." Amended Declaration of Taking, 4/27/22 ¶6 (emphasis added). The "business" RBMN referred to in the declaration was Russell Standard, an asphalt company which is located to the immediate south of the Property. The Wolfes filed preliminary objections, arguing, *inter alia,* RBMN's proposed taking was "not for a public purpose, but [was] rather to confer a private benefit on RBMN's customer" Russell Standard, and was thus "impermissible and should be struck." Preliminary Objections, 5/20/22 ¶44.[4]

---

[3] The injunction is not at issue in the present appeal.

[4] The ensuing litigation involved arguments by both parties based on the "public use/public purpose" standard of the Fifth Amendment to the United States Constitution, which prohibits seizure of private lands except for "public use." *See* U.S. Const. amend. (continued…)

The trial court held a hearing on June 2, 2022, and heard testimony describing RBMN's plans for placement of the new siding and its potential harm to the Wolfes. Gary Wolfe testified that he believed RBMN's purpose in expanding the spurs across his property was "[j]ust to service Russell Standard." N.T. Preliminary Objections Hearing, 6/2/22 at 48. Wolfe opined "Russell Standard has the space and the wherewithal to use their own property to put the rail across . . . and [it] do[es]n't have to be on [his] property at all." *Id.* at 59. Wolfe also clarified Russell Standard is already transporting by trucks and private haulers the materials it wants to import via rail. *See id.* at 37.

Jeffrey Koller, the manager of the roofing business leasing the Property, testified the expansion of the rail line would run through the driveway it uses to transport its vehicles and equipment. Koller feared the installation would "disrupt[]" its "business on a daily basis" and prevent the company from "getting [its] equipment in and out" should its "traffic and the railroad traffic intersect[] one another." *Id.* at 19, 22. As a result, Koller explained, his company renewed its lease with the Wolfes only "for a year until this

---

V ("[N]or shall private property be taken for public use, without just compensation."); *see also* Appellant's Brief at 12. The Pennsylvania Constitution offers an overlapping protection, providing "nor shall private property be taken or applied to public use, without authority of law and without just compensation being first made or secured." PA. CONST. art. I, §10. Despite the slight difference in language between the two Constitutions, "Pennsylvania courts have frequently interpreted the federal and state constitutional provisions in a similar fashion." Jennifer DiGiovanni *et. al.*, *Governmental Takings (Eminent Domain), in* THE PENNSYLVANIA CONSTITUTION: A TREATISE ON RIGHTS AND LIBERTIES, §13.4(a), 535 (Ken Gormley & Joy G. McNally eds., 2d ed. 2020). Indeed, our own case law makes clear "the power of eminent domain . . . is restrained by our federal and state Constitutions, and may be further limited by statute. . . . The primary federal and state constitutional limitation imposed on the exercise of this power by the Commonwealth, or by any entity to which the Commonwealth has delegated such power, is that private property may only be taken to serve a public purpose." *Robinson Twp. v. Commonwealth*, 147 A.3d 536, 586 (Pa. 2016), *citing, inter alia, In re Opening Priv. Rd. for Benefit of O'Reilly*, 5 A.3d 246, 258 (Pa. 2010) (*O'Reilly II*) ("The Constitutions of the United States and Pennsylvania mandate that private property can only be taken to serve a public purpose.").

[litigation] was settled" and would decide whether to agree to the originally intended "five-year extension based upon the outcome." *Id.* at 12.

The Wolfes also called Greg Bogia to testify as a land development expert, traffic expert, professional engineer, and professional traffic operations engineer. *See id.* at 67. Bogia described the issues the expansion would create on the Property, explaining the access points where RBMN intends to place gates will necessarily change how the Property complies with occupancy requirements. For example, Bogia explained the 3907 parcel requires fifteen parking spaces to comply with the applicable zoning ordinances, but RBMN's plan will cause it to lose ten spaces. *See id.* at 75-76. Bogia opined that, as a result, the building at 3907 – which houses the Wolfes' commercial tenant – would be "out of compliance with the township and [it] may not be able to continue functioning as it does today." *Id.* at 77. Bogia noted the Wolfes could theoretically add parking spots to the east of the buildings, but he explained it would require that they "undertake a subdivision annexation process with Muhlenberg Township to make that happen[,]" and "[i]t's still not likely" this would bring them back into compliance with the zoning ordinances. *Id.* at 85-86. He also opined the plan would landlock "the entire 3901 parcel and possibly even the 3907 parcel should any rail cars be stopped at th[e] location." *Id.* at 78. To remedy these problems, Bogia suggested RBMN relocate the proposed crossing "approximately 50 to 70 feet to the south" onto Russell Standard's property. *Id.* at 94.

In response, RBMN called its own land development and zoning expert, Michael Bercek, to testify. Bercek opined that eight parking spots – not ten – would be "[p]otentially" removed through RBMN's taking plan and claimed they could be reconfigured elsewhere on the Wolfes' property; but Bercek's proposed reconfiguration recaptured only three parking spots. *See id.* at 122, 128-29. Bercek also testified RBMN

could not relocate the crossing seventy feet south as that would put it close to a fire hydrant and force RBMN to deal with underlying utilities encased in concrete, which would be a complex and expensive process. *See id.* at 123-26. However, he conceded RBMN never asked him to consider an alternative route to avoid the Wolfes' property. *See id.* at 131. Similarly, Matthew Johnson, the vice president of asset management and community affairs at RBMN, testified he did not know if RBMN had "considered alternative routes." *Id.* at 113. When pressed by the trial court regarding why RBMN could not place the spur further south on Russell Standard's property, RBMN's counsel stated its current proposed location over the Property had already been approved, and any change would force it to "redo an application to the [PUC]" which "would not work for Russell Standard's purposes." *Id.* at 24.

The trial court sustained the Wolfes' preliminary objections, finding RBMN's "condemnation was effectuated solely to benefit a single private commercial enterprise, Russell Standard, and as such, violated the prohibition on using eminent domain for private purposes." Trial Court 1925(a) Opinion, 7/27/22 at 12. Specifically, the court observed as the "power of eminent domain may only be exercised for a public purpose[,]" its use is limited "to the extent reasonabl[y] required by the public purpose for which the power is exercised, or else it will be overturned as excessive." *Id.* at 11-12, *citing Reading Area Water Auth. v. The Schuylkill River Greenway Ass'n*, 100 A.3d 572 (Pa. 2014). The court found RBMN's proposed condemnation would be made "at the behest of and for the sole use of Russell Standard," and does not benefit the public "in any way" considering "[t]he only goods moved on the rail will be those bought by Russell Standard[,]" RBMN "will serve no other customers[,]" and RBMN "will provide no public transportation." *Id.* at 12. It further noted "[t]he public will buy Russell Standard's asphalt regardless of whether or not the needed materials arrive by rail or truck to Russell Standard's plant." *Id.*

According to the court, RBMN's refusal to consider placing the spurs on Russell Standard's property indicated RBMN was "protecting Russell Standard's interest not to clutter its property with tracks where the rail cars could sit indefinitely until the products are needed. Instead, it intends to clutter [the] Wolfes' property." *Id.* at 13. The court concluded "[t]o condemn land owned by the Wolfes, so Russell Standard can commercially profit from the land to the Wolfes' detriment serves a purely private, and thus, unconstitutional interest." *Id.* at 12.[5] Alternatively, the court found even assuming *arguendo* that a railroad can "condemn any property it wishes," RBMN's condemnation is excessive. *Id.* RBMN filed a motion for reconsideration, which the trial court denied. RBMN appealed to the Commonwealth Court.

A unanimous three judge panel of the Commonwealth Court reversed in an unpublished memorandum. It began its analysis by reciting general eminent domain principles regarding railroad takings identified or established in *Pioneer Coal Co. v. Cherrytree & Dixonville Railroad Co.*, 116 A. 45 (Pa. 1922). The panel observed railroad officials are presumed to "have performed their duty in good faith[] when they declare a public necessity for an extension" "unless the contrary is plainly shown[.]" *Wolfe v. Reading Blue Mountain & N. R.R. Co.*, Nos. 649, 722 C.D. 2022, 2022 WL 16909471, at *3 (Pa. Cmwlth., Nov. 14, 2022) (unpublished memorandum), *quoting Pioneer Coal,* 116 A. at 48. Significantly, the panel described the constitutional "public use/public purpose" requirement by relying on the *Pioneer Coal* standard, noting "[w]hat constitutes public use" requires the "section of road about to be constructed will in some direct way tend to contribute to the general public welfare, or the welfare of a considerable element of the

---

[5] The Pennsylvania General Assembly has enacted additional **statutory** limitations to the exercise of eminent domain, *see, e.g.*, Property Rights Protection Act (PRPA), 26 Pa.C.S. §§201-208, discussed in more detail *infra*, but the trial court's opinion referred only to the general **constitutional** "public use" mandate.

public[.]" *Id.* at *4, *quoting Pioneer Coal*, 116 A. at 48. It emphasized "the mere fact that some selfish interest may have inspired the plan for the part in controversy in no sense **prevents** that section from being classed as a 'branch' road, or for public use." *Id.* at *4, *quoting Pioneer Coal*, 116 A. at 48 (emphasis in original; other emphasis & footnote omitted). The panel then described this Court's subsequent opinion in *C.O. Struse & Sons Co. v. Reading Co.*, 153 A. 350 (Pa. 1931), which stated "[t]he right to build branch railroads . . . has been many times affirmed by th[e Pennsylvania Supreme C]ourt." *Id.* at *5, *quoting C.O. Struse*, 153 A. at 352 (omission and second alteration in original); *see also id.* (consolidating cases).

The panel then considered RBMN's analogy of Russell Standard, an asphalt plant, to the coal mine in *Pioneer Coal* and the manufacturing plant in *C.O. Struse* – access to both of which via the construction of branch roads this Court found served a public purpose. The panel opined the RBMN's taking was proper, and reasoned its decision was "[c]onsistent with *Pioneer Coal* and the Pennsylvania Supreme Court's statements in *C.O. Struse* that '[a] branch or spur track may constitute a part of the railroad's transportation facilities although when constructed it may lead only to a single industry[,]' and '[t]here is no controlling distinction between a coal mine or manufacturing plant which serves the public and a merchandise establishment, which does the same[,]' *C.O. Struse*, 153 A. at 352[.]'" *Id.* Relying on "the 'strong presumption that the condemnor has acted properly[,]' *In re Condemnation No. 2*, 943 A.2d [997, 1002 (Pa. Cmwlth. 2007)]," the panel "conclude[d] that RBMN's condemnation is for a public purpose and, thus, the trial court erred in sustaining the Wolfes' Preliminary Objection[.]" *Id*.

The Wolfes filed a petition for allowance of appeal, which we granted in part, to consider the following issue: "Whether the Commonwealth Court erred by reversing the [trial court] where it held that the taking at issue was for a public purpose and based its

decision on caselaw addressing the public use requirement for a condemnation under eminent domain powers created prior to the passage of the Property Rights Protection Act, 26 Pa. [C.S.] §201, *et seq.*" *Wolfe v. Reading Blue Mountain & N. R.R. Co.*, 300 A.3d 1006 (Pa. 2003) (*per curiam*) (alterations in original). As the appeal presents a question of law, our standard of review is *de novo* and our scope of review is plenary. *See Pa. Env't Def. Found. v. Commonwealth*, 279 A.3d 1194, 1202 (Pa. 2022). An appellate court reviewing an eminent domain proceeding considers "whether the lower court abused its discretion or committed an error of law[, and] whether the findings of fact were supported by substantial evidence." *Szabo v. Dep't of Transp.*, 202 A.3d 52, 58 (Pa. 2019) (opinion announcing judgment of court). Mindful of these principles, we proceed to consider the parties' arguments.

II.

The Wolfes claim the Commonwealth Court erred by failing to affirm the trial court where the condemnation at issue was undertaken for a private purpose. They argue the panel erroneously relied on century-old decisions that no longer reflect the current legislature's desire to limit eminent domain powers and protect against condemnations made for a private purpose. As evidence of this evolution of legislative intent, the Wolfes point to the Property Rights Protection Act (PRPA), 26 Pa.C.S. §§201-208, which expressly prohibits "the exercise by any condemnor of the power of eminent domain to take private property in order to use it for private enterprise" "[e]xcept as set forth in subsection (b)." 26 Pa.C.S. §204(a). Although the Wolfes concede subsection (b) of the PRPA explicitly exempts public utilities and railroads from this prohibition, *see id.* §204(b)(2)(1), they submit its enactment in 2006 "demonstrated the legislature's intent to revisit eminent domain law in the Commonwealth and to reinforce protections against unlawful takings." Appellants' Brief at 12. According to the Wolfes, case law that predates

the PRPA "no longer accurately reflects the intention of the Pennsylvania legislature[,]" is less persuasive, and should be afforded less weight. *Id.* at 10. Specifically, the Wolfes observe the underlying statutes in older cases like *Pioneer Coal* and *C.O. Struse* "originated during the Commonwealth's infrastructure boom and contributed to the 'widespread dissatisfaction' that led to the passage of the first Eminent Domain Code in 1964." Appellants' Reply Brief at 2 (citation omitted). The Wolfes contend "one of the reasons for enacting the Eminent Domain Code was to acknowledge a 'revised concept of what constitutes public use,' which apparently could not be reconciled with prior statutes." *Id.* (citation omitted).

Although railroads are generally excused from the additional statutory proscription imposed by Section 204(a) of the PRPA, the Wolfes insist this "does not mean that courts should consider the 'public use' of a railroad's condemnation by a more lenient standard than given to other condemnors or that it is any less important to strictly review the purpose of a railroad's use of its eminent domain powers." *Id.* They argue RBMN must still separately meet the "more stringent test in this Commonwealth . . . that a public purpose is the 'primary and paramount' reason for its taking[.]" Appellants' Brief at 35. Otherwise, the Wolfes caution, railroads would be permitted "to condemn any property, so long as it puts track on it, regardless of the purpose for which it does so – simply because the condemnor is a railroad. If that is the case, then this Court's jurisprudence related to a public versus private purpose analysis would be meaningless." *Id.* at 32. The Wolfes further warn "[s]uch a ruling would lead eminent domain law in Pennsylvania into a more expansive direction, contrary to our Legislature's [p]ost-*Kelo*[6] goals in enacting the PRPA and contrary to this Court's recent decisions." Appellants' Reply Brief at 9.

---

[6] The United States Supreme Court in *Kelo v. City of New London*, 545 U.S. 469 (2005), upheld a city's exercise of eminent domain over non-blighted properties to further its economic development plan as a constitutionally sufficient "public use." Fearing the *Kelo* (continued…)

The Wolfes also contend the pre-PRPA cases on which the Commonwealth Court panel relied for its constitutional public use analysis, namely *Pioneer Coal* and *C.O. Struse*, are easily distinguishable as those railroads provided evidence establishing the purported benefits of the taking to the public, while RBMN identified none. In *Pioneer Coal*, for example, which affirmed a railroad's taking of private land to allow rail access to a private coal company, this Court found the "life, happiness and prosperity of the people of Pennsylvania depend[ed] to a very large degree upon getting the coal supply" that would be assured by the railroad's taking. *Pioneer Coal*, 116 A. at 52. Similarly, the *C.O. Struse* Court found the public would benefit by the extension of a rail line to reach a private company's manufacturing plant since the plant provided mail service and was a major supplier of consumer goods to Pennsylvanians. *See C.O. Struse,* 153 A. at 351. In contrast, the Wolfes assert RBMN provided no evidence of how the public would benefit by Russell Standard's ability to receive materials via rail instead of truck. Indeed, the Wolfes argue the entire focus of RBMN's plan is to provide convenient service to Russell Standard, with no consideration of public benefit at all.

Moreover, the Wolfes point out the legislation authorizing railroad takings on which the *Pioneer Coal* and *C.O. Struse* Courts relied was "passed in the heyday of Pennsylvania's push to build railroad infrastructure" and employed a different analysis to determine whether a taking qualified as a "public use" such that constitutional requirements were satisfied. Appellants' Reply Brief at 3-4. To demonstrate their takings satisfied a "public use" in the 1920s and 1930s, railroads needed only to show the use "tend[ed] to contribute to the general public welfare, or the welfare of a considerable

<hr/>

majority would "wash out any distinction between private and public use of property[,]" *Kelo*, 545 U.S. at 494 (O'Connor, J., dissenting), the Pennsylvania General Assembly passed the PRPA to "prevent[ ] the type of situation that occurred in the *Kelo* case[,]" that is, to stop eminent domain from being "used for economic development without a finding of blight." PA. S. JOURNAL, 189th G.A., 2005 Reg. Sess. No. 73, 1064 (Dec. 7, 2005).

element of the public" "in some direct way." *See Pioneer Coal*, 116 A. at 48; *C.O. Struse*, 153 A. at 352. The Wolfes contend the "public use" standard has since evolved and now requires the public be the "primary and paramount beneficiary" of its taking. *See* Appellants' Reply Brief at 4, *quoting Middletown Twp. v. Lands of Stone*, 939 A.2d 331, 337 (Pa. 2007); *see also id.* (explaining that, although the general "Constitutional requirement that a taking be for a public purpose has not changed," this Court began using the "primary and paramount beneficiary language" "prior to the passage of the PRPA, but well after *Pioneer Coal* and *C.O. Struse*") (internal quotation marks omitted).

The Wolfes assert the Commonwealth Court erred by not evaluating whether the public was the "primary and paramount beneficiary" according to the evidence on record, and instead deciding a taking for railroad expansion was "*de facto*[] for a public purpose." Appellants' Brief at 30. Had the panel conducted the proper analysis based on the record, the Wolfes insist it would have found RBMN's taking unconstitutional. "While [RBMN]'s Declaration gives lip service to its business purposes (*e.g.*[,] 'to promote the health, safety and general welfare of the Commonwealth of Pennsylvania by serving the public need to have goods transported via rail')," the Wolfes contend "the true purpose" of the taking is "to provide rail services to" Russell Standard. *Id.* at 25, *quoting* Amended Declaration of Taking, 4/27/22 ¶6. Despite having "ample opportunity to offer evidence of how its taking would be for a public purpose," the Wolfes submit RBMN "failed to produce a single piece of evidence supporting that contention. Any public benefit that [RBMN] now claims is speculative and incidental, not based on any evidence that [RBMN] introduced into the record." *Id.* at 13. The Wolfes observe information regarding the potential benefits to the environment and infrastructure RBMN now raises "was not presented at the trial level and, even if accurate, provid[es] only an indirect benefit [which] should not suffice to establish that [RBMN's] taking was for a public purpose." Appellants' Reply Brief at 6-7;

*see also id.* at 7 ("To permit [RBMN] to introduce arguments and alleged information at this late stage of litigation would be highly prejudicial to [the Wolfes]. Such information was not subject to admissibility in accordance with the Rules of Evidence, leaving [the Wolfes] with no opportunity to challenge the veracity of such information."). "At best," the Wolfes assert, "this case is similar to *O'Reilly* [where] there could be some indirect public benefit in permitting [RBMN]'s taking but [RBMN] has made 'no attempt to confirm that the public is the primary and paramount beneficiary.'" Appellants' Brief at 26, *quoting O'Reilly II*, 5 A.3d at 258 (refusing to uphold condemnation despite incidental public benefit).

In response, RBMN submits this "Court has held that a taking effectuated to connect a private entity to a railroad via a rail siding serves a public purpose by allowing the movement of goods in commerce. . . . [, t]herefore, under this Court's longstanding precedent, RBMN's taking serves a public purpose." Appellee's Brief at 7, *citing Pioneer Coal*, 116 A. at 48; *and C.O. Struse*, 153 A. at 352. RBMN maintains the law regarding railroad condemnation was not altered by the PRPA as evidenced by its explicit exemption of railroads and the legislative history. RBMN asserts the original version of the PRPA only exempted "common carriers" from Section 204(a)'s general proscription against takings for private use, but was amended in subsequent versions to explicitly exempt public utilities and railroads. *See id.* at 14*, comparing* S. 881, 190th Gen. Assemb., Reg. Sess., Printer No. 1180 (Pa. 2006) *with* S. 881, 190th Gen. Assemb., Reg. Sess., Printer Nos., 1368, 1402, 1414, 17388 (Pa. 2006). Accordingly, RBMN maintains the "change in the bill drafts shows a conscious decision by the General Assembly to have the powers of railroads, and public utilities, remain the same after the passage of the act." *Id*. This special exception is necessary, RBMN contends, to overcome the "assembly problem" railroads face when trying to acquire property required to connect

customers to service. *Id*. at 15. According to RBMN, without railroads' expansive eminent domain power, property owners could "'hold up' the development and demand unreasonable compensation because he or she knows the project cannot be assembled without his or her parcel." *Id.*, *quoting* Alexandra B. Klass, *The Frontier of Eminent Domain,* 79 U. COLO. L. REV. 651, 700 n.27 (2008). RBMN emphasizes the Wolfes admitted a railroad's taking is not barred by Section 204(a) and acknowledged the PRPA's exception for railroads in its briefs before this Court and the lower court. Thus, RBMN insists it is undisputed that the PRPA does not bar a railroad's taking for private use. *See id.* at 16.

Moreover, RBMN argues since the PRPA specifically exempted railroads from its purview, it did not alter the legal landscape of precedent dealing with railroad takings. RBMN urges these foundational cases are just as persuasive – and binding – as ever. It points to our more recent decision in *Reading Area Water Authority*, wherein this Court explained "[t]he Legislature's decision to exempt regulated public utilities[] . . . from the preclusive rule set forth in Section 204(a) demonstrates that it intended to allow – within constitutional limitations – the continued use of eminent domain for the provision of public services such as water and sewer access in tandem with private development for a limited, defined class of condemners [only]." 100 A.3d at 584.

RBMN insists the "primary and paramount beneficiary" standard "is entirely consistent with the standard articulated in" *Pioneer Coal* and *C.O. Struse* requiring the taking "contribute to the general public welfare" "in some direct way." Appellee's Brief at 20. Although the language may be different, RBMN maintains both standards require that a taking "primarily benefit[] the public." *Id.* at 21. As such, RBMN contends *Lands of Stone* merely reiterated the "primary and paramount beneficiary" standard which had

been in place since 1966, when it was first articulated in *Price v. Philadelphia Parking Authority*, 221 A.2d 138, 147 (Pa. 1966).

RBMN claims its taking satisfies the constitutional public use requirement even under the "primary and paramount beneficiary" standard. RBMN states it is a public utility with 400 miles of railroad track allowing for the transportation of passengers and property throughout the Commonwealth. As a public utility, RBMN asserts it has the "right to take, occupy and condemn property[,]" 15 Pa.C.S. §1511(a), and its taking "does not lose its public character merely because there may exist in the operation [ ] some feature of private gain, for if the public good is enhanced it is immaterial that a private interest also may be benefitted." Appellee's Brief at 11, *quoting In re Legis. Route 62214, Section 1-A*, 229 A.2d 1, 3 (Pa. 1967). Thus, it argues "[a] taking is proper if the benefit to the public is primary and any benefit to a private individual is only incidental." *Id.* (citation omitted). RBMN maintains that even if Russell Standard incidentally benefits from its taking, the public is the primary beneficiary as the expansion will "provid[e] rail service to an asphalt producer that serves the public." *Id.* at 25. RBMN also claims its taking will serve more than just Russell Standard, as it provides an extension that other businesses — including the one located on the Property — may utilize in the future. *See id.* at 26.

Furthermore, RBMN insists allowing Russell Standard to use a rail line instead of trucks to import necessary materials will remove hundreds of trucks from Pennsylvania roads, and will consequently benefit the environment by reducing gas emissions and infrastructure by reducing wear and tear on public roads and the cost of maintenance. *See id.* at 27. RBMN also claims transportation via rail will prove more economical to move bulk goods, which would allow Russell Standard to sell its goods at a lower price to the public. Finally, RBMN notes the "existence of alternative modes of transport" – that is, Russell Standard's current ability to use trucks to import the necessary materials –

cannot defeat the authority of railroads to exercise the power of eminent domain, otherwise such power "would be wholly eviscerated." *Id*. RBMN thus submits its taking serves a public purpose and "the Wolfes have not articulated an argument sufficient to overcome the presumption that RBMN's taking of a portion of the [Property] is lawful." *Id.* at 28.[7]

III.

In Pennsylvania, railroads are public utilities authorized "to take, occupy and condemn property" as "reasonably necessary or appropriate [to] accomplish[] . . . [t]he transportation of passengers or property or both as a common carrier[.]" 15 Pa.C.S. §1511(a)(1). Railroad takings are governed by the Eminent Domain Code. *See* 26 Pa.C.S. §102(a) ("This title provides a complete and exclusive procedure and law to govern all condemnations of property for public purposes and the assessment of damages."); *see also id.* 1985 cmt. ("the code applies to all public utility condemnations"). Moreover, the PRPA's general prohibition against "tak[ing] private property in order to use it for private enterprise," 26 Pa.C.S. §204(a), "does not apply if . . . [t]he property is taken

---

[7] CSX Transportation, Inc., Norfolk Southern Railway Company, and Consolidated Rail Corporation filed an *amici curiae* brief in support of RBMN. *Amici* reiterate much of RBMN's arguments, insisting the instant taking serves a public purpose by connecting RBMN's customer to a national rail network as "the public [] has long been recognized to benefit from a functional national rail network." *Amici* Brief at 16. *Amici* warn adopting the Wolfes' desired "outcome would dramatically truncate railroads' authority to exercise eminent domain[,]" "thereby limiting railroads' flexibility to expand their networks in the future and depriving the public of the recognized economic, environmental, and safety benefits of shipping goods via rail." *Amici* Brief at 21.

The Energy Association of Pennsylvania also filed an *amicus* brief in support of RBMN. It expressed concern that reversing the Commonwealth Court's decision could cripple public utilities' power. The Energy Association points out railroads and public utilities provide critical services to and for the public; the Public Utility Code even defines a railroad as a "public use" and service "to or for the public[.]" *Amicus* Brief at 12, *citing* 66 Pa.C.S. §102. It asserts adopting the Wolfes' logic "would lead to more expensive and less efficient infrastructure investments and extensions of service to customers, the cost of which would be passed onto the public utilities' customers." *Id.* at 4.

by . . . [a] public utility or railroad[.]" 26 Pa.C.S. §204(b)(2)(i). Although the expressed purpose of the PRPA's prohibition against takings for private purposes is to "protect the rights of property owners above all other interests," the legislature nevertheless carved out a clear exception from that prohibition for railroads. Pa. Gov. Mess., *Protecting Property Owners' Rights* (May 4, 2006); *see also id.* ("The general prohibition would not apply to property: [ t]aken for a common carrier, public utility or railroad[.]"). The unambiguous language of the PRPA thus definitively exempts railroads from additional **statutory** limitations on takings. However, subsequent case law clarifies that applicable constitutional limitations remain relevant and apt. *See, e.g., Reading Area Water Auth.*, 100 A.3d at 584 ("[t]he Legislature's decision to exempt regulated public utilities . . . from the preclusive rule set forth in Section 204(a) demonstrates that it intended to allow – **within constitutional limitations** – the continued use of eminent domain for the provision of public services . . . in tandem with private development for a limited, defined class of condemnors") (emphasis added).

Accordingly, as Section 204(a) of the PRPA does not by itself prohibit the present taking, we now consider the applicable constitutional limitations on eminent domain. Landowners generally are entitled to the continued ownership and use of their private property; the government may seize private lands only for "public use" and with "just compensation." *See* U.S. CONST. amend. V. And, in Pennsylvania, "[t]he Commonwealth transfers to her citizens her power of eminent domain only when some existing public need is to be supplied, or some present public advantage is to be gained." *Edgewood R.R. Co.'s Appeal*, 79 Pa. 257, 269 (1875). Since the invention of railroads, the Commonwealth has permitted railroad companies to seize land "to provide for the convenience and necessities of masses of men, and not to promote private fortunes or develop private property." *Id.* Although "[t]here is no constitutional or statutory definition

of the words 'public use,'" this Court initially interpreted it to mean "a use or right of use by the public[.]" *Pa. Mut. Life Ins. Co. v. City of Phila.*, 88 A. 904, 907 (Pa. 1913) (quotation marks and citation omitted). Notably, the Court also warned against allowing "an incidental benefit[] resulting to the public from the mode in which individuals in pursuit of their own interests use their property, [to] constitute a public use, within the intention of the Constitution, [as] it will [then] be found very difficult to set limits to the power of appropriating private property.'" *Id.* (citation omitted). Even a hundred years ago, this Court expressed concern that interpreting mere incidental benefits to the public as sufficient to pass constitutional muster would degrade the constitutional protections afforded to landowners.

The *Pioneer Coal* and *C.O. Struse* Courts evaluated the "public use" condition under a less stringent standard requiring only that the proposed use "tend[s] to contribute to the general public welfare, or the welfare of a considerable element of the public" "in some direct way." *Pioneer Coal*, 116 A. at 48; *C.O. Struse*, 153 A. at 352. They analyzed whether the taking directly benefitted the public by considering the type of goods being transported, the number of Pennsylvania consumers relying on the deliveries, and possible alternate uses for the expansion such as the transportation of passengers. The *Pioneer Coal* Court, for example, found that although the extension would "be largely employed to take coal from the [private company's] properties," "the life, happiness, and prosperity of the people of Pennsylvania depend[ed] to a very large degree upon getting the coal supply of the state out of the mines, on its way to the consumer[.]" *Pioneer Coal*, 116 A. at 48. Similarly, the *C.O. Struse* Court affirmed a railroad company's taking of private land to construct a branch road to reconnect a single commercial entity, a Sears, Roebuck & Company (Sears) plant, with its main line. Though Sears was a private business, the Court emphasized the massive influence and consumer base the company

possessed in Pennsylvania and nationally.  *See C.O. Struse*, 153 A. at 351 (explaining Sears employs seventy-five postal employees; conducts business "with hundreds of thousands of customers;" and transports approximately four million consignments of merchandise, the gross earnings from which were over $700,000 on the instant rail line alone).  Considering the large percentage of the public buying from and relying on Sears goods, the Court found transporting merchandise from Sears via rail served "a large percentage of the public[.]"  *Id.*

Although *C.O. Struse* and *Pioneer Coal* maintain precedential value, they are distinguishable from the present appeal.  These older decisions involved detailed analyses regarding the apparent benefits to the public in materially dissimilar factual scenarios and were decided at a time when the railroad industry's contribution to national transportation infrastructure was considered *per se* inherently beneficial to the public.  Indeed, with respect to this latter point, both decisions were rendered at a time when the economy and society were much more heavily dependent upon railroads than on other means of transport.[8]  Unsurprisingly, then, the legal analysis in both opinions was undergirded by the belief that construction and maintenance of railroad branches and spurs automatically served a "public use" because of the infrastructure it created, allowing for unparalleled expansion into areas undeveloped at the time, and often presenting the only available method to transport goods to citizens of the Commonwealth.  *See e.g.*, *City of Pittsburgh v. Pa. R.R.,* 48 Pa. 355, 359-60 (1864) (noting construction of a rail line was "most advantageous to all the inhabitants of our western metropolis" as it would "promote the convenience of the inhabitants" and create "an uninterrupted line of travel by land

_____

[8] *See* Corey L. Moomaw, *Rails-to-Trails, A Tale of Uncompensated Kansas Land Takings,* 55 WASHBURN L.J. 295, 295 (2015) ("Railroads brought social, economic, and political change to every city, state, and territory connected by these newly formed arteries of people, money, and resources.  Railroads served the country in this capacity for nearly a century, reaching their zenith in 1920 when the advent of the automobile and trucking industry began to replace railroads.") (footnotes omitted).

from Cincinnati to [New York]"); *and Deemer v. Bells Run R.R. Co.,* 61 A. 1014, 1014 (Pa. 1905) ("To develop undeveloped regions is one of the objects to be attained by railroads, and the tracks of many of them have first been laid in the wilderness. In time there are settlements along them, villages appear, and stations are established as needed. What development may result from the construction of this railroad remains to be seen; but one of its corporate rights is the right to try to develop the country through which it has located its route[.]").

As this situation changed,[9] of course, our decisional law naturally evolved to refine how our courts should assess whether a taking of private property has a "public use." We first used the phrase "primary and paramount" to describe a sufficiently "public" purpose in a case that did not involve eminent domain. *Price*, 221 A.2d at 147. *Price* explored whether a negotiated agreement between a public agency (the Philadelphia Parking Authority) benefitted the public for purposes of complying with the Parking Authority Law, which required such public benefit. *See id.* ("Empowered to act only for the public benefit, the Auth[o]rity may not employ its resources for the primary and paramount benefit of a private endeavor. An engagement essentially private in nature may not be justified on the theory that the public will be incidentally benefited."). The *Price* Court analogized the issue in that case to the question of whether a taking satisfies the public purpose requirement in eminent domain, and summarized the eminent domain standard as requiring "the primary and paramount beneficiary of its exercise" be "the public." *Id*. Significantly, the Court did not credit any Pennsylvania railroad case for this proposition, but instead cited *Belovsky v. Redevelopment Authority of the City of Philadelphia*, 54 A.2d

---

[9] As Justice Mundy's concurrence aptly acknowledges, "we may take judicial notice that more people and goods are transported by automobile and aircraft now[,]" Concurring Opinion (Mundy, J.) at 3, but we certainly do not "pronounce as a matter of law that the railway network is not as important to the economy as it was in a previous era[,]" *id.* at 6.

277 (Pa. 1947), another non-railroad case. However, we soon quoted *Price*'s "primary and paramount beneficiary" language in a railroad case. *See In re Bruce Ave.*, 266 A.2d 96, 99 (Pa. 1970). We ultimately concluded the record in *Bruce Avenue* was insufficient to resolve whether the public was the "primary and paramount" beneficiary of the taking in that case and remanded for further proceedings.

But, in *Lands of Stone*, we plainly stated "a taking will be seen as having a public purpose only where the public is to be the primary and paramount beneficiary of its exercise." *Lands of Stone*, 939 A.2d at 337, *quoting Bruce Ave.*, 266 A.2d at 99. We directed courts in such cases to "look[] for the 'real or fundamental purpose' behind a taking." *Id., quoting Belovsky,* 54 A.2d at 283. "Stated otherwise, the **true** purpose must primarily benefit the public." *Id.* (emphasis in original). "This means that the government is not free to give mere lip service to its authorized purpose or to act precipitously and offer retroactive justification." *Id.* at 338. We have continued in our most recent cases to apply this standard, reiterating "[t]he Constitutions of the United States and Pennsylvania mandate that private property can only be taken to serve a public purpose. . . . [and] to satisfy this obligation, the public must be the primary and paramount beneficiary of the taking." *O'Reilly II*, 5 A.3d at 258 (citations omitted). *See also Robinson Twp.*, 147 A.3d at 586; Concurring Opinion (Mundy, J.) at 5 (recognizing "'primary and paramount' language is simply a more modern label given to the [public purpose] concept").

Accordingly, it is only when the public will be the "primary and paramount beneficiary" of the taking that the usual constitutional protections over private land may be lifted. The Commonwealth Court acknowledged this standard in its opinion but apparently did not apply it against the present record, which establishes RBMN did not have to traverse the Wolfes' land to accomplish its goal of connecting Russell Standard to its rail network, and RBMN's taking was intended "primarily to serve [their] private

interest in saving time and money."  Concurring Opinion at 7 (Mundy, J.), *citing* Trial Court 1925(a) Opinion, 7/27/22 at 15-17.  In fact, the court engaged in very little analysis before concluding "RBMN's condemnation is for a public purpose."  *Wolfe*, 2022 WL 16909471 at *5.  The panel may have assumed because railroad expansions were once traditionally considered a default public use, regardless of any incidental benefit to a private party, the present taking by RBMN automatically satisfied the public use requirement.  Essentially, the panel held the taking serves a public purpose as a matter of law, simply because it was effectuated by a railroad.  But if this were correct, our centuries-old jurisprudence regarding private-versus-public-purposes in railroad takings would be entirely redundant.  *See, e.g.*, *McCandless's Appeal*, 70 Pa. 210 (1871); *Edgewood R.R. Co.'s Appeal*, 79 Pa. 257 (1875); *Deemer*, 61 A. 1014 (Pa. 1905); *Pioneer Coal*, 116 A. 45 (Pa. 1922); *C.O. Struse*, 153 A. 350 (Pa. 1931).

Although it is true that railroad companies, like other public utilities seeking to take private property by eminent domain, are presumed to be serving an inherently public function, a landowner challenging the taking may override that presumption by showing "clearly that the proposed construction is not for a public use."  *C.O. Struse*, 153 A. at 352.  *See also Deemer*, 61 A. at 1014 ("[T]he burden of showing that the [railroad] company is exercising franchises [which] it does not possess is upon those alleging that [the corporation] is attempting to do what it is not authorized to do – constructing a railroad for purely private purposes.").  The burden may be a "heavy one[,]" *Bruce Ave.,* 266 A.2d at 99, but the Wolfes satisfied it here.

The Wolfes introduced evidence that the only beneficiary of the taking would be a private business, Russell Standard.  Mr. Wolfe's unrefuted testimony also established Russell Standard already uses trucks and private haulers to transport the materials it seeks to import via rail, and thus, does not depend upon rail service to create or distribute

its goods. *See* N.T. Preliminary Objections Hearing, 6/2/22 at 37. In addition, the Wolfes' expert opined the RBMN expansion would likely render the existing business on the Property non-compliant with the municipality's zoning requirements and therefore unable to continue operations. Relying on this evidence, the trial court found RBMN's taking "was effectuated solely to benefit a single private commercial enterprise, Russell Standard[.]" Trial Court 1925(a) Opinion, 7/27/22 at 12. In response, RBMN did not introduce any evidence of any specific benefit to the public, relying instead on the inherent benefits purportedly created by railroads *qua* railroads, generally. Indeed, RBMN simply claimed the expansion would "serv[e] the public need to have goods transported via rail." Amended Declaration of Taking, 4/27/22 ¶6.

As the trial court observed, the taking here — use of the siding across the Wolfes' property — would not transport either goods or passengers. It will benefit one private commercial entity, Russell Standard.[10] The court rejected RBMN's factual claim the Property's tenants might use the rail line once built, and credited the evidence indicating the expansion could trigger a zoning violation that would threaten the business conducted by the Wolfes' existing tenant and drive it out of its lease on the Property. The record supports the trial court's findings that the short rail expansion proposed here would not

---

[10] Our learned colleague believes "Russell Standard cannot possibly be the sole beneficiary of the proposed rail link[,]" and imagines there are myriad other entities that must "necessarily" benefit from the taking because, among other theoretical things, "there are many socially-beneficial uses of asphalt[.]" Concurring Opinion (Mundy, J.) at 5 & n.3. This may be true, but RBMN did not adduce evidence of these specific advantages, or that the public would be the primary and paramount beneficiary, as it might have done. *See, e.g.*, *C.O. Struse*, 153 A. at 351 (railroad's taking of private land to reach Sears plant served public use as Sears employed seventy-five postal employees; conducted business "with hundreds of thousands of customers"; and transported approximately four million consignments of merchandise annually).

serve the "public," beyond allowing Russell Standard to transport materials it currently moves by truck via rail.[11]

Obviously, railroads still contribute to interstate and intrastate commerce, and accordingly still enjoy a specific exemption from the PRPA's general prohibition against taking for a private purpose. But any taking by a railroad does not warrant an automatic and conclusive finding of benefit to the public. Instead, courts must analyze any purported public benefit of the taking while considering the technological, social, and economic landscape "of the period in which the particular problem presents itself for consideration." *Dornan v. Phila. Housing Auth.*, 200 A. 834, 840 (Pa. 1938). *See also Kelo*, 545 U.S. at 482 ("Viewed as a whole, our jurisprudence has recognized that the needs of society have . . . evolved over time in response to changed circumstances."). The present record shows a railroad taking private land to service one private company: Russell Standard. We easily conclude the Wolfes met their burden by demonstrating the public is not the primary and paramount beneficiary of RBMN's taking.

IV.

Accordingly, we hold the trial court correctly sustained the Wolfes' preliminary objections and dismissed the underlying condemnation action. The Commonwealth Court's contrary decision is reversed and the matter remanded for reinstatement of the order of the court of common pleas.

Jurisdiction relinquished.

Chief Justice Todd and Justices Donohue, Brobson and McCaffery join the opinion.

---

[11] To the extent RBMN now speculates in this Court about public benefits pertaining to the environment or infrastructure, *see* Appellee's Brief at 27, we note it failed to include these claims in its declaration of taking or in opposition to the Wolfes' preliminary objections, nor did it present evidence in the trial court to support them. We thus consider these arguments waived.

Justice Wecht files a concurring opinion.

Justice Mundy files a concurring opinion.